UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

ORIGINAL

- - - - - - - - - - - - - - - - - - -x

UNITED STATES OF AMERICA            :       SEALED
                                            INDICTMENT
            -v.-                    :
                                            12 Cr.
WILBUR ANTHONY HUFF,                :
MATTHEW L. MORRIS, and
ALLEN REICHMAN,                     :

            Defendants.  **12 CRIM 750**



- - - - - - - - - - - - - - - - - - -x

<u>COUNT ONE</u>

**(Wire Fraud Related to O2HR)**

The Grand Jury charges:

<u>BACKGROUND REGARDING THE DEFENDANTS
AND THE RELEVANT ENTITIES</u>

<u>Wilbur Anthony Huff</u>

1.    At all times relevant to this Indictment, WILBUR
ANTHONY HUFF, the defendant, resided in Cayneville and
Louisville, Kentucky and maintained an office in Louisville,
Kentucky.  HUFF controlled, in whole or in part, numerous
business entities located throughout the United States, which he
used to engage in various and related fraud and bribery schemes,
as alleged in Counts One through Thirteen of this Indictment.

2.    The entities WILBUR ANTHONY HUFF, the defendant,
controlled, in whole or in part, included the following, among
others: (i) Florida-based O2HR, LLC ("O2HR"), a professional
employer organization ("PEO"), its purported holding company,
Oxygen Unlimited, LLC, ("Oxygen Unlimited") and related PEO

companies (collectively the "Oxygen Entities"), which provided outsourced management of payroll, tax and insurance obligations for client companies; (ii) General Employment Enterprises, Inc. ("GEE"), a publicly-traded temporary staffing company headquartered in Illinois; (iii) U.S. Insurance Group ("USIG"), a Tennessee-based insurance broker; (iv) SDH Realty, Inc. ("SDH"), a purported real estate holding company; and (v) several purported holding and investment companies, including River Falls Financial Services, LLC, River Falls Financial Group, River Falls Holdings, LLC, and related companies (collectively, the "River Falls Entities"); and (vi) Alexander and Alexander, Inc., a company that purportedly served as an insurance agent for O2HR (collectively, the "HUFF-Controlled Entities").

3.    Because WILBUR ANTHONY HUFF, the defendant, was a convicted felon, HUFF faced legal and practical barriers to operating business entities in his own name, particularly businesses in regulated industries, including insurance, banking and professional employer organizations. Accordingly, at various times relevant to this Indictment, and in part to conceal HUFF's true exercise of control over the HUFF-Controlled Entities' finances and operations, HUFF installed other individuals to operate those entities' day-to-day functions and to serve as the entities' titular owners, directors or officers.

## Park Avenue Bank

4.   At all times relevant to this Indictment, The Park Avenue Bank ("Park Avenue Bank"), the deposits of which were insured by the Federal Deposit Insurance Corporation ("FDIC"), was headquartered in New York, New York and was a New York State chartered bank.  From in or about June 2004 until in or about October 2009, Charles J. Antonucci, Sr. ("Antonucci"), was President and Chief Executive Officer ("CEO") of Park Avenue Bank.  During various times relevant to this Indictment, WILBUR ANTHONY HUFF, the defendant, maintained at least 22 bank accounts at Park Avenue Bank, through which he controlled the finances of the HUFF-Controlled Entities and orchestrated his schemes to defraud.

## Matthew L. Morris

5.   At all times relevant to this Indictment, MATTHEW L. MORRIS, the defendant, was a Senior Vice President at Park Avenue Bank.  MORRIS managed Park Avenue Bank's relationships with HUFF and the HUFF-Controlled Entities, and was the bank's primary liaison for banking transactions related to the bank accounts for the HUFF-Controlled entities.

## Allen Reichman

6.   At all times relevant to this Indictment, ALLEN REICHMAN, the defendant, was an Executive Director of Investments at an investment bank and financial services company (the

"Investment Firm") headquartered in New York, New York.

<u>OVERVIEW OF THE DEFENDANTS' ILLEGAL SCHEMES</u>

7.      Between in or about 2007 and in or about 2010,
WILBUR ANTHONY HUFF, the defendant, orchestrated numerous
interrelated schemes to defraud, through which he unlawfully took
and received tens of millions of dollars from clients, active
businesses and financial institutions, and used these funds to
benefit himself, his family and other companies and accounts in
which he had interests and obligations.  Integral to the success
of these fraudulent schemes was HUFF's corrupt relationship with
Park Avenue Bank executives MATTHEW L. MORRIS, the defendant, and
Antonucci.  As set forth in this Indictment, HUFF, MORRIS and/or
REICHMAN engaged in the following illegal schemes:

a.      <u>Fraud on O2HR Clients and the IRS</u>: As set
forth in Counts One through Seven, from in or about 2008 until in
or about 2010, HUFF defrauded O2HR and its clients in excess of
$58,000,000 in funds that had been provided to O2HR to cover tax
and insurance obligations, which O2HR had contracted to pay to
the Internal Revenue Service ("IRS") and others on O2HR's
clients' behalf.  HUFF, however, directed that these funds be
paid to himself and other interests, many of which were
completely unrelated to O2HR.

b.      <u>Bribery of MORRIS and Antonucci</u>: As set forth
in Counts Seven and Eight, from in or about 2007 up to and

4

including in or about 2009, HUFF paid hundreds of thousands of dollars in payments and bribes to MORRIS and Antonucci in exchange for MORRIS and Antonucci providing favorable treatment at Park Avenue Bank, including, but not limited to, causing the bank to issue fraudulent letters of credit for $1,750,000, allowing the HUFF-Controlled Entities to accrue overdrafts in excess of $9,000,000, facilitating intra-bank transfers in furtherance of HUFF's frauds, and fraudulently causing Park Avenue Bank to issue at least approximately $4,500,000 in loans to HUFF-Controlled Entities.

c.   <u>Fraud on Bank Regulators and the GEE Board of Directors and Shareholders</u>: As set forth in Counts Nine through Twelve, in an effort to bolster Park Avenue Bank's capital, HUFF, MORRIS, Antonucci and others known and unknown orchestrated a series of fraudulent transactions to make it appear that Park Avenue Bank had received an outside infusion of $6,500,000, and engaged in a series of further fraudulent actions to conceal from bank regulators the true source of the funds – Park Avenue Bank, itself.

d.   <u>Fraud on Insurance Regulators</u>: As set forth in Count Thirteen, HUFF, MORRIS, REICHMAN, Antonucci and others known and unknown conspired to defraud Oklahoma insurance regulators by making material misrepresentations and omissions regarding the source of $37,500,000 used to purchase Providence

Property and Casualty Insurance Company ("Providence P&C"), an Oklahoma insurance company that provided workers' compensation insurance for O2HR's clients.

### THE FRAUD ON O2HR CLIENTS AND THE IRS: BACKGROUND

8.    The IRS is an agency of the United States Department of Treasury, responsible for administering and enforcing the tax laws of the United States, and collecting the taxes that are due and owing to the Treasury of the United States by its citizens and businesses. One type of taxes, commonly referred to as employment taxes, includes the following:

a.    Federal Income Tax Withholding ("withholding taxes"): In general, an employer must deduct and withhold income tax on the amount of wages it paid to its employees, and pay over those amounts to the IRS.

b.    Federal Insurance Contribution Act taxes ("FICA taxes"): The FICA tax is comprised of two elements: old-age, survivor and disability insurance, which is commonly referred to as "Social Security," and health insurance, which is commonly referred to as "Medicare." Social Security taxes are used to fund retirement and disability benefits, while Medicare taxes are used to provide health and medical benefits for the aged and disabled. FICA tax payments are made up of the employer's and employee's equal shares of: (i) 6.2% of wages towards Social Security, and (ii) 1.45% towards Medicare,

6

totaling 15.3% of wages.

9.    From in or about 2005 up to and including in or about January 2010, O2HR was a professional employer organization ("PEO") headquartered in Tampa, Florida.  O2HR, like other PEOs, provided outsourced management of the payroll, tax and workers' compensation insurance obligations of client companies, including the collection and remittance of employment taxes.  In contracts with its client companies, O2HR specifically agreed to "make the appropriate payroll deductions and collection of taxes, file the appropriate reports and make payment to proper governmental authorities for federal, state and local income taxes, Social Security tax, federal and state unemployment insurance taxes and any other federal or state tax."  In addition, in many contracts, O2HR agreed to secure workers' compensation insurance coverage for client company employees, where such insurance coverage was required by law.

10.    For each pay period and in response to invoices sent by O2HR, its clients paid a lump sum to O2HR that included funds to cover employee gross wages, tax and workers' compensation insurance obligations, and a fee for the services provided by O2HR, as detailed in the invoices.  In 2008 and 2009, the majority of these payments were sent by electronic funds transfers from client companies located throughout the country, including in Florida, New Jersey and Minnesota, to bank accounts

at Park Avenue Bank in New York, New York.

11. Among the tax services O2HR provided to its clients was the preparation of Employer's Quarterly Federal Tax Returns – IRS Forms 941 – which, pursuant to the Internal Revenue Code and relevant regulations, employers were required to file with the IRS on a quarterly basis. Among other things, Forms 941 reported the total wages paid by an employer to its employees during the relevant reporting period, as well as the amounts owed to the IRS for withholding and FICA taxes.

12. In addition to preparing and submitting Forms 941 for its clients, O2HR also contracted to remit to the IRS the employment taxes of its clients. Payments for these taxes were to be, and were in fact, paid to O2HR by its client companies.

13. Although there were slight variations in the manner by which O2HR provided payroll services for its corporate clients, O2HR typically carried out those services in the following manner:

a. First, using data provided by the client regarding the hours worked by their employees during a particular pay period, one or more O2HR employees prepared an invoice for the client setting forth the gross wages for each employee, the employer's contributions for employment taxes and workers' compensation insurance, and O2HR's fee. O2HR then transmitted the invoice to the client, by fax or electronic mail.

b.  The client company then reviewed the invoice and remitted payment by: (i) wiring funds to bank accounts maintained by the Oxygen Entities at Park Avenue Bank and other banks; (ii) sending funds via Automated Clearing House ("ACH") transfers to accounts maintained by the Oxygen Entities at Park Avenue Bank and other banks; or (iii) mailing checks to O2HR's offices in Florida.

c.  O2HR sent to the client company, by overnight mail, physical paychecks or direct deposit receipts for that pay period's payroll. With these checks or receipts, O2HR also sent reports indicating, among other things, (i) the amount of money it withheld from each employee's paycheck for employment taxes, which O2HR was obligated to pay over to the IRS, and (ii) the amount paid to O2HR by the client company to cover the cost of workers' compensation insurance.

14.  From at least in or about 2006 up to and including in or about 2010, WILBUR ANTHONY HUFF, the defendant, covertly controlled O2HR and its finances. By design, HUFF had no official position at O2HR. Rather, he installed individuals over whom he exerted control, including a chief executive officer ("CEO") ("CC-1"), to run O2HR's daily operations. At all times relevant to this Indictment, however, HUFF controlled O2HR's finances, including millions of dollars held in bank accounts maintained at Park Avenue Bank. HUFF controlled these finances

not only through the CEO, but also through HUFF's administrative assistant ("HUFF's Assistant"), who had primary signing authority over almost all of the HUFF-Controlled Entities' bank accounts. Pursuant to HUFF's directive, HUFF's Assistant needed HUFF's authorization for any significant expenditure, including but not limited to, the payment of tax and insurance obligations on behalf of O2HR's clients.

THE SCHEME TO DEFRAUD

15. From at least in or about 2008 up to and including in or about 2010, WILBUR ANTHONY HUFF, the defendant, through his covert control of O2HR and its finances, devised and engaged in a scheme to defraud O2HR's clients and the IRS. HUFF stole and converted to his own and other uses tens of millions of dollars from O2HR's clients that had been entrusted to O2HR to satisfy the clients' employment tax and insurance obligations. Despite collecting from its clients funds sufficient to cover their tax and workers' compensation insurance obligations in 2008 and 2009, because of HUFF's fraudulent scheme, O2HR failed to pay in excess of $58,000,000 due to the IRS and to Providence P&C, an insurance provider.

16. Among the means and methods by which HUFF carried out the scheme were the following:

a. From in or about 2008 up to and including in or about 2009, O2HR's clients sent funds to O2HR to cover their

10

employment tax liabilities in response to invoices from O2HR. Instead of paying those funds over to the IRS, as O2HR had represented in its contracts and invoices that it would do, WILBUR ANTHONY HUFF, the defendant, directed O2HR employees to delay and ultimately stop making payments to the IRS on behalf of O2HR's clients. HUFF further directed O2HR employees to file at least one IRS Form 941 that falsely understated O2HR's tax obligation.

        b.    Similarly, in 2008 and 2009, O2HR's clients sent funds to O2HR to cover their workers' compensation obligations, in response to invoices from O2HR. Instead of paying the insurance obligations in full for these clients, as O2HR had represented in its contracts and invoices that it would do, HUFF failed to make millions of dollars in payments to Providence P&C, the relevant insurance provider.

        17.   Through this scheme to defraud, WILBUR ANTHONY HUFF, the defendant, caused O2HR to fail to pay the IRS approximately $53,000,000 in employment taxes, and deceived O2HR's clients into believing that their tax obligations had been paid in full. HUFF further caused O2HR and related companies to fail to pay in excess of $5,000,000 in insurance-related obligations to Providence P&C. Instead of using O2HR clients' funds to pay their tax and insurance obligations, over the course of the scheme HUFF diverted this money from O2HR to various

accounts that HUFF controlled (the "HUFF-Controlled Accounts"), and the money was then used for other purposes, much of which were completely unrelated to O2HR. For example, HUFF diverted millions of dollars of O2HR funds to his investments in unrelated business ventures and to pay for the personal expenses of HUFF and HUFF's family members, including mortgages on properties that had no connection to O2HR, such as HUFF's homes, rent payments for HUFF's children's apartments, vacations, staff and equipment for HUFF's farm, designer clothing, jewelry and luxury cars.

STATUTORY ALLEGATION

18. From at least in or about 2008 up to and including in or about 2010, in the Southern District of New York and elsewhere, WILBUR ANTHONY HUFF, the defendant, willfully and knowingly, having devised and intending to devise a scheme and artifice to defraud, and for obtaining money and property by means of false and fraudulent pretenses, representations, and promises, did transmit and cause to be transmitted by means of wire communication in interstate and foreign commerce, writings, signs, signals, pictures, and sounds for the purpose of executing such scheme and artifice, to wit, HUFF engaged in a scheme to defraud O2HR's clients and the IRS, among others, by collecting payments from O2HR clients under the false pretenses of satisfying tax and insurance obligations for such clients and then diverting those funds to himself and others, and, in the

course of executing such scheme, caused emails with money transfer instructions to be sent from, among other locations, Louisville, Kentucky to New York, New York, including on or about February 13, 2009, and caused interstate wire transfers of money to and from New York, New York, including on or about June 12, 2009 and November 2, 2009 and in or about December 2009.

(Title 18, United States Code, Section 1343 and 2.)

## COUNTS TWO THROUGH SIX

### (Tax Evasion)

The Grand Jury further charges:

19.   The allegations contained in paragraphs 1 through 17 above are hereby repeated, realleged, and incorporated by reference as if fully set forth herein.

20.   From at least in or about 2008 up to and including in or about 2010, in the Southern District of New York and elsewhere, WILBUR ANTHONY HUFF, the defendant, willfully and knowingly did attempt to evade and defeat a substantial part of the federal employment taxes due and owing by the clients of O2HR, as set forth below, to the United States for various quarters of each said calendar year by various means, including, among other things, by directing that monies collected from O2HR clients for the purpose of paying federal employment taxes not be paid to the United States, resulting in the approximate taxes due and owing as set forth below:

| Count | Year - Quarter | Approximate Tax Due | Approximate Tax Paid | Approximate Taxes Due and Owing |
|-------|----------------|---------------------|----------------------|----------------------------------|
| Two   | 2008 - 4th     | $29,726,433         | $19,543,215          | $10,183,218                      |
| Three | 2009 - 1st     | $17,075,540         | $10,961,356          | $6,114,184                       |
| Four  | 2009 - 2nd     | $16,841,190         | $7,917,038           | $8,924,151                       |
| Five  | 2009 - 3rd     | $16,877,620         | $3,256,030           | $13,621,589                      |
| Six   | 2009 - 4th     | $16,689,514         | $2,438,436           | $14,251,077                      |

(Title 26, United States Code, Section 7201; Title 18, United States Code, Section 2.)

## COUNT SEVEN

**(Corruptly Endeavoring to Obstruct and Impede the Due Administration of the Internal Revenue Laws)**

The Grand Jury further charges:

21.  The allegations contained in paragraphs 1 through 17, above are hereby repeated, realleged, and incorporated by reference as if fully set forth herein.

22.  From at least in or about 2008 up to and including in or about 2010, in the Southern District of New York and elsewhere, WILBUR ANTHONY HUFF, the defendant, did corruptly obstruct and impede, and endeavor to obstruct and impede, the due administration of the Internal Revenue Service laws, by, among other things:

a.  Causing employees of O2HR to file at least one false Form 941;

b.  Causing employees of O2HR to stop filing Forms 941 with the IRS;

14

c.  Causing employees of O2HR to stop making payments to the IRS for employment taxes due and owing that O2HR collected from its clients;

d.  Causing the diversion of money received by O2HR from its clients for the payment of employment taxes to other HUFF-Controlled Entities and to HUFF's own personal use;

e.  Causing the concealment from O2HR's clients of the fact that O2HR failed to pay over a substantial portion of the employment taxes that clients remitted to O2HR in satisfaction of their tax obligations; and

f.  Concealing HUFF's interest in and control over O2HR by employing various nominee individuals and entities, which HUFF controlled.

(Title 26, United States Code, Section 7212(a).)

## COUNT EIGHT

### (Conspiracy to Commit Bank Bribery)

The Grand Jury further charges:

23.  The allegations contained in paragraphs 1 through 17 above are hereby repeated, realleged, and incorporated by reference as if fully set forth herein.

### HUFF'S BRIBERY OF ANTONUCCI AND MORRIS

24.  From at least in or about 2008 up to and including in or about 2009, WILBUR ANTHONY HUFF, the defendant, provided at least approximately $400,000 and other benefits, to MATTHEW L.

15

MORRIS, the defendant, and Antonucci in an effort to corruptly influence and obtain favorable treatment from these bank executives in connection with HUFF's banking relationship at Park Avenue Bank. Specifically, in exchange for these payments and benefits, MORRIS and Antonucci, among other things (i) provided, at HUFF's request, two fraudulent letters of credit totaling $1,750,000; (ii) allowed the HUFF-Controlled Entities to accrue in excess of $9,000,000 in overdrafts; (iii) facilitated intra-bank transfers in furtherance of HUFF's frauds; and (iv) fraudulently approved millions of dollars in loans to HUFF-Controlled Entities.

## Fraudulent Letters of Credit

25. In or about June 2008, WILBUR ANTHONY HUFF, the defendant, paid MATTHEW L. MORRIS, the defendant and Antonucci approximately $350,000 in exchange for, among other things, providing fraudulent letters of credit for $1,750,000 from Park Avenue Bank to aid HUFF in obtaining a significant investment in one of the HUFF-Controlled Entities. At HUFF's direction, and without thoroughly evaluating the investment, Antonucci advised an outside investor ("Investor-1"), in sum and substance, that a proposed $1,750,000 investment in a HUFF-Controlled Entity was sound. Then, on or about July 7, 2008, again at HUFF's direction, MORRIS and Antonucci prepared two Park Avenue Bank letters of credit obligating Park Avenue Bank to repay Investor-1

if HUFF failed to repay the investment principal by in or about July 2013 (the "Letters of Credit"). Park Avenue Bank received no security in exchange for providing the Letters of Credit nor was there any other economic justification for Park Avenue Bank providing the Letters of Credit. On or about July 17 and July 18, 2008, Investor-1 paid HUFF approximately $1,750,000, in part because Investor-1 believed his investment was fully protected by the Letters of Credit. At HUFF's direction, the $1,750,000 was deposited in an account that HUFF controlled at Park Avenue Bank ("Account-1").

26. At or around the same time, HUFF sent an electronic mail message to Antonucci thanking him for "all you do for our company and me" and that Antonucci's help was "very much needed and appreciated."

27. With Investor-1's money in hand, WILBUR ANTHONY HUFF, the defendant, used a portion of this investment to make bribe payments to MATTHEW L. MORRIS, the defendant, and Antonucci. On or about July 18, 2008, the same day that Investor-1 provided HUFF with his investment, HUFF directed that a cashier's check in the amount of $350,000 (the "$350,000 Check") be written with funds from Account-1 to an associate of MORRIS ("W-1"). MORRIS and Antonucci subsequently received this $350,000, as set forth below:

a. On or about July 18, 2008, upon receiving the

check, W-1 deposited it in his account at a bank in New York, New York.

      b.   On or about July 25, 2008, at MORRIS's direction, W-1 withdrew $250,000 in United States currency from the same account in which he deposited the $350,000 Check and provided the money to MORRIS.

      c.   MORRIS subsequently provided approximately $250,000 in United States currency to Antonucci.

      d.   In addition, for the next several months, W-1 made periodic payments to and for the benefit of MORRIS in a total amount of approximately $100,000, including paying approximately $52,000 towards MORRIS's credit card and other debt, $15,000 to MORRIS's partner in a purported business venture unrelated to Park Avenue Bank, and another approximately $30,000 in United States currency to MORRIS directly.

<u>Overdrafts</u>

      28.  WILBUR ANTHONY HUFF, the defendant, managed his illegal schemes through at least 22 accounts maintained in the names of HUFF-Controlled Entities at Park Avenue Bank (the "HUFF Accounts"). In violation of Park Avenue Bank policy, MORRIS and Antonucci allowed HUFF to freely overdraw the HUFF Accounts in amounts totaling in excess of $9,000,000 at Park Avenue Bank. These overdrafts were millions of dollars more than other bank customers were typically allowed. MORRIS and Antonucci approved

these overdrafts despite the fact that Park Avenue Bank suffered from low capital levels.

Intra-Bank Transfers

29. In addition, from in or about 2007 up to and including in or about 2009, WILBUR ANTHONY HUFF, the defendant, directed a large number of intra-account transfers between the HUFF Accounts and commingled money among seemingly unrelated companies, a practice that had brought scrutiny from bank officials at banks where HUFF previously controlled accounts, and had ultimately resulted in HUFF being forced to close accounts at those banks. At Park Avenue Bank, however, MORRIS, a Senior Vice President, facilitated these types of transactions for HUFF.

$4.5 Million in Loans

30. In or about March 2009, in exchange for the payments and other benefits provided by WILBUR ANTHONY HUFF, the defendant, Antonucci assisted HUFF in fraudulently obtaining at least approximately $4,500,000 in loans. As set forth below, HUFF and Antonucci devised and engaged in a scheme to defraud Park Avenue Bank and bank regulators by circumventing Park Avenue Bank's review procedures for loans exceeding $1,500,000 and by submitting loan applications containing false and fraudulent statements (the "Loan Applications"):

a. Park Avenue Bank policy required loan applications seeking more than $1,500,000 to be submitted to the

19

Board of Directors for approval. At or around the time Park
Avenue Bank issued the $4,500,000 in loans, in or about March
2009, the HUFF-Controlled Entities owed Park Avenue Bank at least
approximately $9,000,000 as a result of overdrafts, as discussed
above in paragraph 28. These excessive overdrafts and other
regulatory concerns would have prevented Park Avenue Bank's Board
of Directors from approving additional debt to any HUFF-
Controlled Entity during the relevant time period. Antonucci,
however, had the power to approve any loan of $1,500,000 or less.
Thus, to circumvent review of the Loan Applications by the bank's
Board, Antonucci and HUFF devised a scheme to submit applications
for three loans of $1,500,000 each, totaling $4,500,000, to three
different HUFF-Controlled Entities.

          b.    Although WILBUR ANTHONY HUFF, the defendant,
and Antonucci fraudulently circumvented Park Avenue Bank's
policy, HUFF and Antonucci further agreed that HUFF would submit
false and fraudulent application documents to make the loans
appear to be legitimate should the Board or bank regulators later
review the transactions. The Loan Applications: (i) falsely
stated that the $4,500,000 sought by the HUFF-Controlled Entities
was for working capital for those companies; and (ii) vastly
overstated the assets and net worth of certain guarantors for the
loans. In truth and in fact, and as HUFF well knew, (i) the loan
proceeds would be, and in fact were, immediately transferred to

other Park Avenue Bank accounts controlled by HUFF and were used to pay down the approximately $9,000,000 in overdrafts accrued by other HUFF-Controlled Entities at the bank; and (ii) the guarantors for the loans had significantly less assets than stated in the Loan Applications.

        c.    For example, in support of HUFF's application for a $1,500,000 loan to Alexander & Alexander Risk Services, LLC ("Alexander"), a HUFF-Controlled Entity, HUFF's long-time administrative assistant ("HUFF's Assistant") was listed as the guarantor of the loan. The application included HUFF's Assistant's personal financial statement, which, at HUFF's direction, stated that HUFF's Assistant held a 99 percent ownership in Alexander and had total purported assets of approximately $2,500,000. In truth and in fact, and as HUFF and Antonucci well knew, HUFF's Assistant was an owner of Alexander in name only; HUFF had complete control over Alexander. Furthermore, at the time of the loan application, HUFF's Assistant did not have any significant assets, much less the $2,500,000 listed in the application submitted to Park Avenue Bank.

        d.    After WILBUR ANTHONY HUFF, the defendant, submitted the Loan Applications, Antonucci approved all three of the loans without the Board of Directors' approval and, as described above, HUFF used the $4,500,000 in proceeds to pay down

overdrafts for other HUFF-Controlled Entities.

## STATUTORY ALLEGATIONS

31.  From at least in or about 2007 up to and including
in or about 2009, in the Southern District of New York and
elsewhere, WILBUR ANTHONY HUFF and MATTHEW L. MORRIS, the
defendants, and others known and unknown, willfully and knowingly
did combine, conspire, confederate, and agree together and with
each other to commit bank bribery in violation of Sections
215(a)(1) and (a)(2) of Title 18, United States Code, to wit,
HUFF paid hundreds of thousands of dollars to MORRIS and
Antonucci in exchange for MORRIS and Antonucci providing HUFF
favorable treatment at Park Avenue Bank, including but not
limited to, causing the bank to provide fraudulent letters of
credit totaling $1,750,000, allowing the HUFF-Controlled Entities
to accrue overdrafts in excess of $9,000,000, facilitating intra-
bank transfers in furtherance of HUFF's frauds, and fraudulently
causing Park Avenue Bank to issue at least approximately
$4,500,000 in loans to HUFF-Controlled Entities.

32.  It was a part and an object of the conspiracy that
WILBUR ANTHONY HUFF, the defendant, did corruptly give, offer,
and promise something of value to persons, to wit, MATTHEW L.
MORRIS, the defendant, and Antonucci, with intent to influence
and reward such officers, directors, employees and agents of a
financial institution in connection with business and

22

transactions of such institution.

33. It was further a part and an object of the conspiracy that MATTHEW L. MORRIS, the defendant, and Antonucci, as officers, directors, employees and agents of a financial institution, willfully, knowingly, and corruptly solicited and demanded for their own benefit and for the benefit of other persons, and corruptly accepted and agreed to accept, things of value from persons, to wit, WILBUR ANTHONY HUFF, the defendant, intending to be influenced and rewarded in connection with the business and transactions of such institution.

## OVERT ACTS

34. In furtherance of the conspiracy and to effect the illegal objects thereof, the following overt acts, among others, were committed in the Southern District of New York and elsewhere:

a. On or about July 18, 2008, HUFF directed that a cashier's check from Park Avenue Bank in the amount of $350,000 from Park Avenue Bank in New York, New York be paid to W-1.

b. On or about July 25, 2008, MORRIS received approximately $250,000 in United States currency from W-1 in New York, New York.

c. In or about July 2008, MORRIS signed the Letters of Credit.

(Title 18, United States Code, Section 371.)

## COUNT NINE

### (Conspiracy to Commit Bank Fraud Related to $4.5 Million in Loans)

The Grand Jury further charges:

35. The allegations contained in paragraphs 1 through 17 and 24 through 30 above are hereby repeated, realleged, and incorporated by reference as if fully set forth herein.

36. From at least in or about February 2009 up to and including in or about March 2009, in the Southern District of New York and elsewhere, WILBUR ANTHONY HUFF, the defendant, and others known and unknown, willfully and knowingly did combine, conspire, confederate, and agree together and with each other to commit bank fraud, in violation of Section 1344 of Title 18, United States Code, to wit, HUFF and others known and unknown engaged in a scheme to defraud Park Avenue Bank by preparing and submitting loan applications: (i) that contained false information; and (ii) in a manner that evaded review and approval by the bank's Board in order to obtain $4,500,000 in loan proceeds.

37. It was a part and an object of the conspiracy that WILBUR ANTHONY HUFF, the defendant, and others known and unknown, willfully and knowingly, would and did execute and attempt to execute a scheme and artifice to defraud a financial institution, the deposits of which were then insured by the Federal Deposit

Insurance Corporation, and to obtain moneys, funds, credits, assets, securities, and other property owned by, and under the custody and control of, such financial institution, by means of false and fraudulent pretenses, representations, and promises, in violation of Title 18, United States Code, Section 1344.

OVERT ACTS

38.  In furtherance of the conspiracy and to effect the illegal object thereof, the following overt acts, among others, were committed in the Southern District of New York and elsewhere:

a.  In or about February 2009, HUFF directed HUFF's Assistant to sign a false and fraudulent loan application.

b.  In or about March 2009, HUFF caused the Loan Applications to be submitted to Park Avenue Bank in New York, New York.

c.  In or about March 2009, HUFF directed that approximately $4,500,000 in loan proceeds be transferred to Park Avenue Bank accounts in New York, New York that he controlled.

(Title 18, United States Code, Section 1349.)

## COUNT TEN

### (Conspiracy to Commit Fraud on Bank Regulators)

The Grand Jury further charges:

39.   The allegations contained in paragraphs 1 through
17 and 24 through 30 above are hereby repeated, realleged, and
incorporated by reference as if fully set forth herein.

### BACKGROUND

40.   At all times relevant to this Indictment, USIG was
a Tennessee-based insurance broker.   In or about 2008, WILBUR
ANTHONY HUFF, the defendant, induced USIG's owners to give HUFF
control over a USIG account at Park Avenue Bank.

41.   At all times relevant to this Indictment, GEE was
a publicly-traded temporary staffing company, headquartered in
Illinois.   In or about July 2009, an attorney who had represented
HUFF, a co-conspirator not named herein ("CC-2"), purchased the
majority of GEE shares for approximately $1,900,000.   HUFF-
Controlled Entities provided the entire $1,900,000 that CC-2 used
to purchase the GEE shares.   Subsequently, GEE appointed HUFF's
business associate, another co-conspirator not named herein
("CC-3"), to be its CEO.

42.   At all times relevant to this Indictment, Park
Avenue Bank was subject to the banking laws and regulations of
the FDIC, and of the agency then known as the New York State
Banking Department ("NYSBD"), and was accordingly required to

maintain certain levels of capital on deposit sufficient to cover
potential obligations. Regulators typically rated Park Avenue
Bank and other banks as "well-capitalized," "adequately
capitalized," or "undercapitalized." Banks that were "adequately
capitalized" were required to obtain permission from the
regulators to engage in certain banking transactions. Banks that
were "undercapitalized" were prohibited from engaging in certain
types of banking transactions, and were subject to a range of
potential enforcement actions by regulators.

43. On or about August 20, 2008, the FDIC informed
Park Avenue Bank's Board of Directors that, as of March 31, 2008,
the bank was merely "adequately capitalized," and accordingly
imposed certain restrictions. By in or about October 2008, the
bank's capital situation had worsened to the point that the bank
was in danger of becoming "undercapitalized."

44. Beginning in or about September and October 2008,
and continuing until in or about 2009, WILBUR ANTHONY HUFF and
MATTHEW L. MORRIS, the defendants, Antonucci and others known and
unknown, engaged in a scheme to make the bank appear more
capitalized in an effort to prevent it from being deemed
"undercapitalized." HUFF, MORRIS and Antonucci first defrauded
bank regulators by arranging for, and executing, the transfer of
$6,500,000 of Park Avenue Bank's own funds to Antonucci, which
Antonucci then used and publicly claimed as a personal investment

in the bank (the "Round-Trip Transaction"). HUFF, MORRIS and Antonucci subsequently defrauded bank regulators by making, and directing others to make, false statements and false and fraudulent documents to continue to deceive regulators about the true source of the funds used for Antonucci's purported investment. Finally, in another effort to conceal the true source of a portion of the Round-Trip Transaction funds, HUFF, MORRIS and Antonucci took, without authorization, nearly all of GEE's working capital, and defrauded GEE's Board of Directors, outside auditors and shareholders by falsely claiming that GEE's money was being held for GEE's benefit in a Park Avenue Bank certificate of deposit.

### The Round-Trip Transaction

45. In or around October 2008, Antonucci made a purported personal investment in Park Avenue Bank and emphasized to the FDIC that his substantial investment should be favorably considered (i) as stabilizing the bank's capitalization problems, (ii) to permit the bank to engage in certain banking transactions that it would otherwise be prohibited from engaging in, and (iii) in evaluating the bank's application for funds distributed through the United States Treasury Department's Troubled Asset Relief Program ("TARP").

46. Antonucci's purported $6,500,000 investment was critical to Park Avenue Bank because it helped the bank maintain

what appeared to be sufficient capital and, consequently, helped the bank to remain in compliance with federal and state banking regulations. The investment was also critical to HUFF ensuring that he would continue to benefit from his corrupt relationship with Park Avenue Bank executives. In fact, on or about July 6, 2010, in reference to the Round Trip Transaction, HUFF told an associate, in sum and substance, that HUFF had a vested interest in helping Antonucci "shore up" the bank because HUFF was using the bank for his own interests.

47. Shortly after the Round-Trip Transaction, in or about November 2008, in an effort to secure additional capital, Park Avenue Bank applied for approximately $11,352,480 from TARP, including in the application a reference to Antonucci's purported $6,500,000 investment.

48. In truth and in fact, however, and as WILBUR ANTHONY HUFF and MATTHEW L. MORRIS, the defendants, and Antonucci well knew, the $6,500,000 that Antonucci purportedly invested in Park Avenue Bank was not an independent investment in the bank, but rather was money Park Avenue Bank controlled and that HUFF, MORRIS and Antonucci disguised to appear to be an independent investment. Through a series of deceptive, round-trip transactions, existing Park Avenue Bank funds were disguised as loans to HUFF-Controlled Entities, including USIG, and transferred, at HUFF's and MORRIS' direction, into Park Avenue

Bank accounts maintained by these entities; the funds were then transferred from the HUFF-Controlled Entities to Antonucci; and finally, Antonucci transferred the funds back to Park Avenue Bank as a purported personal investment in the bank.

### Concealment of Round-Trip Transaction from Regulators and Others

49. Following the Round-Trip Transaction, WILBUR ANTHONY HUFF and MATTHEW MORRIS, the defendants, and Antonucci continued to defraud regulators by making false statements and taking other steps to hide the true, illicit nature of the Round-Trip Transaction. Among other things, HUFF created or directed the creation of false documents to make it appear to regulators that Antonucci had an independent source of funds for his purported investment. Specifically, in or about October 2009, HUFF engaged attorneys in Louisville, Kentucky to draft false, fraudulent and backdated agreements in an effort to deceive the FDIC into believing that Antonucci earned the $6,500,000 by selling to CC-2 an interest in Bedford Consulting Group ("Bedford"), a small company owned by Antonucci. In truth and in fact, and as HUFF well knew, no such sale of Bedford occurred and, in any event, Bedford had little or no value in or about 2008 and 2009.

50. In addition, in or about April 2009, WILBUR ANTHONY HUFF and MATTHEW L. MORRIS, the defendants, and Antonucci further concealed the Round-Trip Transaction by stealing money

from GEE. Because Park Avenue Bank used a $2,300,000 loan to USIG to execute part of the Round Trip Transaction, USIG technically owed the bank $2,300,000 for that loan – a fact that was in danger of being discovered because USIG had filed for bankruptcy and was therefore under increased scrutiny. To enable USIG to pay back the loan, HUFF stole $2,300,000 – the majority of GEE's working capital – from GEE as follows:

     a.   On or about July 21, 2009, HUFF and MORRIS caused GEE's CEO, CC-3, to authorize the transfer of $2,300,000 from a GEE bank account to purportedly purchase a certificate of deposit at Park Avenue Bank. MATTHEW MORRIS, the defendant, authorized the transaction at Park Avenue Bank. The transfer, however, violated GEE's investment policy and, in any event, GEE never purchased a certificate of deposit from the bank. In truth and in fact, and as HUFF and MORRIS well knew, the $2,300,000 from GEE was used not to buy a certificate of deposit, but to reimburse Park Avenue Bank for the outstanding $2,300,000 loan to USIG. As HUFF and MORRIS were aware, failure to satisfy USIG's debt would have attracted unwanted scrutiny of the loan by regulators and others, and consequently, scrutiny of their involvement in the fraudulent Round-Trip Transaction.

     b.   To hide the improper diversion of GEE's funds from GEE's auditors, Board of Directors and shareholders, WILBUR ANTHONY HUFF and MATTHEW L. MORRIS, the defendants, Antonucci and

others known and unknown created a counterfeit receipt for a
certificate of deposit, which falsely represented that GEE's
$2,300,000 had been invested in a 90-day certificate of deposit
at Park Avenue Bank.  In or about November and December 2009,
when GEE's Audit Committee and outside auditors identified the
missing $2,300,000, HUFF caused approximately $2,300,000 to be
transferred to GEE's bank account from other, unrelated HUFF-
Controlled Entities, including SDH Realty and the Oxygen and
River Falls Entities.  A large portion of this $2,300,000
transferred to GEE was money that O2HR collected from its clients
for their employment tax and other obligations, but which HUFF
diverted to other HUFF-Controlled Entities, including SDH and the
Oxygen and River Falls Entities, and ultimately to GEE.

    51.  In or about 2010, WILBUR ANTHONY HUFF, the
defendant, appeared at Park Avenue Bank's headquarters in New
York, New York, and unsuccessfully attempted to submit the fake
CD receipt in exchange for $2,300,000.

STATUTORY ALLEGATIONS

    52.  From in or about 2008 up to and including in or
about 2010, in the Southern District of New York and elsewhere,
WILBUR ANTHONY HUFF and MATTHEW L. MORRIS, the defendants, and
others known and unknown, willfully and knowingly did combine,
conspire, confederate, and agree together and with each other to
violate Title 18, United States Code, Section 1005, to wit, HUFF,

32

MORRIS and others known and unknown, in an effort to deceive the FDIC and other bank examiners: (i) orchestrated the transfer of approximately $6,500,000 as part of the Round-Trip Transaction; and (ii) caused the creation of false and fraudulent documents, including backdated contracts and a fraudulent Park Avenue Bank certificate of deposit; and (iii) made and caused to be made false statements to bank regulators regarding the source of the funds used in the Round-Trip Transaction.

53.   It was a part and an object of the conspiracy that WILBUR ANTHONY HUFF and MATTHEW L. MORRIS, the defendants, and others known and unknown, willfully and knowingly would and did make false entries in books, reports, and statements of an insured bank, and would and did cause false entries in books, reports and statements of an insured bank to be made, with intent to defraud such bank, and individual persons, and to deceive officers of such bank, and the FDIC, and agents and examiners appointed to examine the affairs of such bank, in violation of Title 18, United States Code, Section 1005.

<u>OVERT ACTS</u>

54.   In furtherance of the conspiracy and to effect the illegal object thereof, the following overt acts, among others, were committed in the Southern District of New York and elsewhere:

a.   On or about October 6 and October 15, 2008,

33

MATTHEW L. MORRIS, the defendant, directed intra-bank transfers between various Park Avenue Bank accounts.

b. In or about October 2009, WILBUR ANTHONY HUFF, the defendant, met with Antonucci in New York, New York, to discuss the FDIC's inquiry in to the Round Trip Transaction.

c. In or about October 2009, HUFF directed an attorney to draft fraudulent purchase agreements related to Bedford Consulting Group, which were then provided to the FDIC.

(Title 18, United States Code, Section 371.)

## COUNT ELEVEN

### (Fraud on the FDIC Related to the $6.5 Million Round-Trip Transaction)

The Grand Jury further charges:

55. The allegations contained in paragraphs 1 through 17, 24 through 30 and 40 through 51 above are hereby repeated, realleged, and incorporated by reference as if fully set forth herein.

56. From in or about 2008 up to and including in or about 2009, in the Southern District of New York and elsewhere, WILBUR ANTHONY HUFF and MATTHEW L. MORRIS, the defendants, willfully and knowingly did make false entries in books, reports, and statements of an insured bank, and caused false entries in books, reports and statements of an insured bank to be made, with intent to defraud such bank, and individual persons, and to deceive officers of such bank, and the FDIC, and agents and

34

examiners appointed to examine the affairs of such bank, to wit, HUFF and MORRIS engaged in a scheme to defraud the FDIC and the NYSBD in connection with their regulation of Park Avenue Bank by falsely representing that Antonucci had invested $6,500,000 of his own funds to provide additional capital to Park Avenue Bank.

(Title 18, United States Code, Sections 1005 and 2.)

### COUNT TWELVE

#### (Conspiracy to Commit Wire Fraud Related to Repayment of $2.3 Million USIG Line of Credit Using GEE Monies)

The Grand Jury further charges:

57. The allegations contained in paragraphs 1 through 17, 24 through 30 and 40 through 51 above are hereby repeated, realleged, and incorporated by reference as if fully set forth herein.

58. In or about 2009, in the Southern District of New York and elsewhere, WILBUR ANTHONY HUFF and MATTHEW L. MORRIS, the defendants, and others known and unknown, willfully and knowingly did combine, conspire, confederate, and agree together and with each other to commit wire fraud in violation of Section 1343 of Title 18, United States Code, to wit, HUFF, MORRIS and others known and unknown, engaged in a scheme to defraud Park Avenue Bank, bank regulators, and GEE's Board of Directors, shareholders and Audit Committee by (i) taking, without proper authorization, $2,300,000 of GEE's money and using it to satisfy the loan that USIG had received as part of the Round-Trip

35

Transaction; (ii) creating false documents, including a fake Park Avenue Bank certificate of deposit; and (iii) making and causing to be made false statements to deceive GEE's Board of Directors, shareholders and Audit Committee into believing that their money had been safely invested at Park Avenue Bank; (iv) and transferring funds by interstate wire back to GEE to cover up the theft of $2,300,000.

59. It was a part and an object of the conspiracy that WILBUR ANTHONY HUFF and MATTHEW L. MORRIS, the defendants, and others known and unknown, willfully and knowingly, having devised and intending to devise a scheme and artifice to defraud, and for obtaining money and property by means of false and fraudulent pretenses, representations, and promises, would and did transmit and cause to be transmitted by means of wire and radio communication in interstate and foreign commerce, writings, signs, signals, pictures, and sounds for the purpose of executing such scheme and artifice, in violation of Title 18, United States Code, Section 1343.

<u>OVERT ACTS</u>

60. In furtherance of the conspiracy and to effect the illegal object thereof, the following overt acts, among others, were committed in the Southern District of New York and elsewhere:

a. In or about March 2009, WILBUR ANTHONY HUFF

and MATTHEW L. MORRIS, the defendants, met with Antonucci at Park Avenue Bank in New York, New York to discuss the satisfaction of USIG's debt at Park Avenue Bank.

b.    In or about July 2009 in New York, New York, MATTHEW L. MORRIS, the defendant, created a fake receipt for a Park Avenue Bank certificate of deposit for the purported benefit of GEE.

c.    On or about August 7, 2009, MORRIS sent an email from New York, New York to GEE's Chief Financial Officer in Oakbrook Terrace, Illinois regarding the whereabouts of GEE's $2,300,000.

d.    In or about November and December 2009, including on or about November 24, 2009 and December 2, 2009, HUFF caused approximately $2,300,000 to be transferred from bank accounts maintained by SDH and the Oxygen and River Falls Entities to bank accounts maintained by GEE in, among other places, New York, New York.

(Title 18, United States Code, Section 1349.)

## COUNT THIRTEEN

### (Conspiracy to Commit Wire Fraud
### Related to Oklahoma Insurance Department)

The Grand Jury further charges:

61. The allegations contained in paragraphs 1 through 17, 24 through 30 and 40 through 51 above are hereby repeated, realleged, and incorporated by reference as if fully set forth herein.

### Background Regarding the Scheme to Defraud the OID

62. At all times relevant to this Indictment, Providence P&C was an insurance company licensed in Oklahoma and which maintained its primary office in Addison, Texas. Providence P&C was licensed by the Oklahoma Insurance Department ("OID"), which regulated various practices of Oklahoma insurance companies. Under the OID's regulations and applicable Oklahoma law, Providence P&C was required to maintain a certain amount of surplus to ensure that adequate funds were on hand to pay policyholders' claims and anticipated claims.

63. WILBUR ANTHONY HUFF, the defendant, through O2HR and other PEOs, purchased workers' compensation insurance from Providence P&C. As of in or about January 2009, HUFF-controlled PEOs owed in excess of $5,000,000 to Providence P&C as a result of HUFF's failure to pay the insurance obligations of the PEO companies' clients, as described in Count One of this Indictment.

38

## The Fraudulent $37.5 Million Purchase of Providence P&C

64. In or about September 2009, WILBUR ANTHONY HUFF, the defendant, and Antonucci devised a scheme in which Antonucci would purchase Providence P&C for $37,500,000. Antonucci subsequently created a company, Park Avenue Insurance, LLC ("Park Avenue Insurance"), to purchase Providence P&C and to serve as a holding company for the operating insurance entity.

65. To finance the purchase, WILBUR ANTHONY HUFF, the defendant, and Antonucci sought the assistance of ALLEN REICHMAN, the defendant, who was an Executive Director of Investments at the Investment Firm. REICHMAN subsequently agreed with HUFF, Antonucci and others known and unknown, to cause the Investment Firm to loan at least approximately $30,000,000 to Park Avenue Insurance to purchase Providence P&C (the "$30,000,000 Loan"), using Providence P&C's assets as collateral for the loan, which HUFF and REICHMAN knew was unlawful. Indeed, after being approached by HUFF and Antonucci regarding the loan, Investment Firm executives and others warned REICHMAN on several occasions that using Providence P&C's assets as collateral for the loan was illegal and that he should not cause the loan to be issued. On or about January 28, 2009, in an effort to deceive executives at the Investment Firm into believing that the Investment Firm could legally issue the $30,000,000 Loan, REICHMAN directed Antonucci to sign a letter that provided false information regarding the

collateral that would be used for the loan. Despite the warnings from Investment Firm executives and others, and REICHMAN's knowledge that the loan was in fact illegal, on or about January 30, 2009, REICHMAN caused the Investment Firm to issue the $30,000,000 Loan to Park Avenue Insurance.

66. Because Providence P&C was an Oklahoma insurance company, Oklahoma state law required that the OID approve its sale to Park Avenue Insurance. To secure this approval, WILBUR ANTHONY HUFF, the defendant, Antonucci, and their representatives, including CC-2, concealed from the OID the true source of the transaction's funding - a loan from the Investment Firm - and instead falsely represented to the OID that Park Avenue Bank was funding the purchase. In furtherance of this false statement, in or about October 2008, MATTHEW L. MORRIS, the defendant, created and provided to the OID a letter that falsely stated that Park Avenue Bank was funding Park Avenue Insurance's $37,500,000 purchase of Providence P&C. In truth and in fact, and as MORRIS well knew, none of the funding for the acquisition came from Park Avenue Bank. Rather, the majority of the $37,500,000 that Park Avenue Insurance used to purchase Providence P&C came from the illegal $30,000,000 Loan. The remaining $7,500,000 came from other Providence P&C assets, which was another aspect of the transaction withheld from the OID by Antonucci's representatives.

67. On or about January 29, 2009, the OID approved the sale based on the false and fraudulent representations by Antonucci's representatives and MORRIS. On or about January 30, 2009, at the Park Avenue Bank in New York, New York, Park Avenue Insurance purchased Providence P&C's assets in exchange for $37,500,000, $30,000,000 of which came from the illegal loan from the Investment Firm.

68. WILBUR ANTHONY HUFF, MATTHEW L. MORRIS and ALLEN REICHMAN, the defendants, each benefitted financially from this scheme to defraud, as set forth below:

a. Immediately after Park Avenue Insurance acquired Providence P&C's assets, HUFF, MORRIS, and Antonucci took millions of dollars from Park Avenue Insurance for themselves and for businesses that had no relation to the insurance company. Specifically, among other payments: (i) in or about May 2009, MORRIS and Antonucci each took approximately $500,000 from Park Avenue Insurance for their personal benefit; (ii) from in or about February 2009 up to and including October 30, 2009, MORRIS received at least approximately $170,000 for purportedly serving as an executive of Park Avenue Insurance, despite having no previous experience in the insurance industry; and (iii) HUFF, with MORRIS's assistance, took $4,000,000 from Park Avenue Insurance, which HUFF then used to continue his illegal scheme related to O2HR, discussed in Count One of this

41

Indictment.

      b.   REICHMAN benefitted financially from the Investment Firm's loan to Park Avenue Insurance. As a prerequisite to authorizing the loan, REICHMAN required that Providence P&C's approximately $53,000,000 bond portfolio, which included its surplus, be transferred to and maintained at the Investment Firm. REICHMAN subsequently received hundreds of thousands of dollars in commissions as a result of these bonds being maintained at the Investment Firm.

      69.  In or about November 2009, Park Avenue Insurance's operating insurance company became insolvent and was placed in receivership because, among other things, its assets, including the state-mandated surplus, were encumbered by the $30,000,000 Loan, and because HUFF, MORRIS, and Antonucci had pilfered the remaining company assets. As a result, state insurance guaranty associations will be required to contribute millions of dollars towards satisfying policyholder claims.

STATUTORY ALLEGATIONS

      70.  From at least in or about July 2008 up to and including in or about November 2009, in the Southern District of New York and elsewhere, WILBUR ANTHONY HUFF, MATTHEW L. MORRIS and ALLEN REICHMAN, the defendants, and others known and unknown, willfully and knowingly did combine, conspire, confederate, and agree together and with each other to commit wire fraud in

42

violation of Section 1343 of Title 18, United States Code, to wit, HUFF, MORRIS, REICHMAN and others known and unknown conspired to defraud the OID by making and causing to be made material misrepresentations and omissions regarding the source of the $37,500,000 used to purchase Providence P&C.

71. It was a part and an object of the conspiracy that WILBUR ANTHONY HUFF, MATTHEW L. MORRIS and ALLEN REICHMAN, the defendants, and others known and unknown, willfully and knowingly, having devised and intending to devise a scheme and artifice to defraud, and for obtaining money and property by means of false and fraudulent pretenses, representations, and promises, would and did transmit and cause to be transmitted by means of wire and radio communication in interstate and foreign commerce, writings, signs, signals, pictures, and sounds for the purpose of executing such scheme and artifice, in violation of Title 18, United States Code, Section 1343.

<u>OVERT ACTS</u>

72. In furtherance of the conspiracy and to effect the illegal object thereof, the following overt acts, among others, were committed in the Southern District of New York and elsewhere:

a. In or about September 2008, WILBUR ANTHONY HUFF, the defendant, met with Antonucci at Park Avenue Bank in New York, New York regarding the acquisition of Providence P&C.

43

b.    In or about October 2008 in New York, New York, MATTHEW L. MORRIS, the defendant, authored a false and fraudulent letter regarding Park Avenue Bank's role in funding the acquisition of Providence P&C.

c.    In or about January 2009 in New York, New York, ALLEN REICHMAN, the defendant, caused the Investment Firm to issue the $30,000,000 Loan to Park Avenue Insurance.

d.    On or about January 30, 2009, MORRIS caused $37,500,000 to be transferred by interstate wire from a bank account at Park Avenue Bank in New York, New York to a bank account in Durant, Oklahoma.

e.    On or about February 13, 2009, MORRIS caused approximately $4,000,000 to be transferred from Park Avenue Insurance to an O2HR account at Park Avenue Bank that HUFF controlled.

(Title 18, United States Code, Section 1349.)

FORFEITURE ALLEGATIONS

73.    As a result of committing the wire fraud offense alleged in Count One of this Indictment, WILBUR ANTHONY HUFF, the defendant, shall forfeit to the United States, pursuant to Title 18, United States Code, Section 981(a)(1)(C) and Title 28, United States Code, Section 2461, any property, real or personal, which constitutes or is derived from proceeds traceable to such offense, including, but not limited to (a) at least $58,000,000

44

in United States currency, in that such sum in aggregate is property representing the amount of proceeds obtained by WILBUR ANTHONY HUFF, the defendant, and others as a result of the offenses, and (B) the following property:

(a) 102 Van Meter St, Clarkson, KY, 42726;

(b) 501 Spring St, Clarkson, KY, 42726;

(c) Cardwell Road South, Morgantown, KY, 42252;

(d) 389 McClure Cemetery Rd, Leitchfield, KY, 42754;

(e) 707 Oxmoor Woods Parkway, Louisville, KY, 40245;

(f) Legacy Golf Course. 400 Golf Course Rd, Leitchfield, KY, 42754;

(g) 1829 Dog Creek Rd, Caneyville, KY, 42721;

(h) 11921 Brinley Ave, Louisville, KY, 40243;

(i) 542 Proffitt Rd, Horse Ranch, KY, 42349;

(j) 501 Hardin St, Leitchfield, KY, 42754;

(k) 313 Longview Park Place, Louisville, KY, 40245;

(l) 315 Longview Park Place, Louisville, KY, 40245;

(m) 2629 Elizabethtown Rd, Leitchfield, KY, 42754; and

(n) 402 Morgantown Rd, Caneyville, KY, 42721.

74. As a result of committing the conspiracy to commit bank bribery offense alleged in Count Eight of this Indictment, WILBUR ANTHONY HUFF and MATTHEW L. MORRIS, the defendants, shall forfeit to the United States, pursuant to Title 18, United States Code, Section 982(a)(2), any property constituting, or derived from, proceeds obtained, directly or indirectly, as a result of such offense, including, but not limited to (a) at least $6,600,000 in United States currency, in that such sum in aggregate is property representing the amount of proceeds obtained by WILBUR ANTHONY HUFF and MATTHEW L. MORRIS, the defendants, and others as a result of the offenses.

75. As a result of committing the conspiracy to commit bank fraud offense alleged in Count Nine of this Indictment, WILBUR ANTHONY HUFF, the defendant, shall forfeit to the United States, pursuant to Title 18, United States Code, Section 982(a)(2), any property constituting, or derived from, proceeds obtained, directly or indirectly, as a result of such offense, including, but not limited to (a) at least $4,500,000 in United States currency, in that such sum in aggregate is property representing the amount of proceeds obtained by WILBUR ANTHONY HUFF, the defendant, and others as a result of the offenses.

76. As a result of committing the conspiracy to commit fraud on bank regulators, fraud on bank regulators, and conspiracy to commit wire fraud offenses alleged in Counts Ten

through Twelve of this Indictment, WILBUR ANTHONY HUFF and

MATTHEW L. MORRIS, the defendants, shall forfeit to the United

States, pursuant to Title 18, United States Code, Section

982(a)(2), any property constituting, or derived from, proceeds

obtained, directly or indirectly, as a result of such offenses.

77. As a result of committing the conspiracy to commit

mail and wire fraud offense alleged in Count Thirteen of this

Indictment, WILBUR ANTHONY HUFF, MATTHEW L. MORRIS and ALLEN

REICHMAN, the defendants, shall forfeit to the United States,

pursuant to Title 18, United States Code, Section 982(a)(2), any

property constituting, or derived from, proceeds obtained,

directly or indirectly, as a result of such offense, including,

but not limited to (a) at least $5,000,000 in United States

currency, in that such sum in aggregate is property representing

the amount of proceeds obtained by WILBUR ANTHONY HUFF, MATTHEW

L. MORRIS and ALLEN REICHMAN, the defendants, and others as a

result of the offenses.

### Substitute Asset Provision

78. If any of the above-described forfeitable

property, as a result of any act or omission of the defendant:

> (a)  cannot be located upon the exercise of due
>      diligence;
>
> (b)  has been transferred or sold to, or deposited
>      with, a third person;

47

(c)   has been placed beyond the jurisdiction of
      the Court;

(d)   has been substantially diminished in value;
      or

(e)   has been commingled with other property which
      cannot be subdivided without difficulty;

it is the intent of the United States, pursuant to Title 18,

United States Code, Section 982(b) and Title 21, United States

Code, Section 853(p), to seek forfeiture of any other property of

said defendant up to the value of the above forfeitable property.

(Title 18, United States Code, Sections 981 and 982; Title 21
United States Code, Section 853; and Title 28, United States
                 Code, Section 2461.)


_____          _____
FOREPERSON                                PREET BHARARA
                                          United States Attorney


48

Form No. USA-33s-274 (Ed. 9-25-58)

## UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF NEW YORK

### UNITED STATES OF AMERICA

- v. -

### WILBUR ANTHONY HUFF,
### MATTHEW L. MORRIS and
### ALLEN REICHMAN

Defendants.

### INDICTMENT

12 Cr.

(Title 18, United States Code,
Sections 2, 371, 1005, 1343, 1349 and
Title 26, United States Code,
7201, 7212(a).)

PREET BHARARA
United States Attorney.

**A TRUE BILL**

_____
Foreperson.

9/27/12 - Filed Sealed Indictment.
dc - Arrest warrants issued.
Judge Gorenstein.
U.S. M.J.