UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #:
DATE FILED: 12/23/14

UNITED STATES OF AMERICA

      -v.-

WILBUR ANTHONY HUFF,

      Defendant.

:
:
:
:
:
:

**INFORMATION**

S3 12 Cr. 750 (NRB)

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

## COUNT ONE
### (Corruptly Endeavoring to Obstruct and Impede
### the Due Administration of the Internal Revenue Laws)

The United States Attorney charges:

### BACKGROUND REGARDING THE DEFENDANT
### AND THE RELEVANT INDIVIDUALS AND ENTITIES

#### Wilbur Anthony Huff

      1.     At all times relevant to this Information, WILBUR ANTHONY HUFF, the defendant, resided in Caneyville and Louisville, Kentucky and maintained an office in Louisville, Kentucky.   HUFF controlled, in whole or in part, numerous business entities located throughout the United States, which he used to engage in various and related fraud and bribery schemes, as alleged in Counts One through Four of this Information.

      2.     The entities WILBUR ANTHONY HUFF, the defendant, controlled, in whole or in part, included the following, among others: (i) Florida-based O2HR, LLC ("O2HR"), a professional employer organization ("PEO"), its purported holding company, Oxygen Unlimited, LLC, ("Oxygen Unlimited") and related PEO companies (collectively the "Oxygen Entities"), which provided outsourced management of payroll, tax and insurance obligations for client companies; (ii) General Employment Enterprises, Inc. ("GEE"), a publicly-traded temporary

staffing company headquartered in Illinois; (iii) U.S. Insurance Group ("USIG"), a Tennessee-based insurance broker; (iv) SDH Realty, Inc. ("SDH"), a purported real estate holding company; and (v) several purported holding and investment companies, including River Falls Financial Services, LLC, River Falls Financial Group, River Falls Holdings, LLC, and related companies (collectively, the "River Falls Entities"); and (vi) Alexander and Alexander, Inc., a company that purportedly served as an insurance agent for O2HR (collectively, the "HUFF-Controlled Entities").

      3.     Because WILBUR ANTHONY HUFF, the defendant, was a convicted felon, HUFF faced legal and practical barriers to operating business entities in his own name, particularly businesses in regulated industries, including insurance, banking and professional employer organizations.   Accordingly, at various times relevant to this Information, and in part to conceal HUFF's true exercise of control over the HUFF-Controlled Entities' finances and operations, HUFF installed other individuals to operate those entities' day-to-day functions and to serve as the entities' titular owners, directors or officers.

Park Avenue Bank

      4.     At all times relevant to this Information, The Park Avenue Bank ("Park Avenue Bank"), the deposits of which were insured by the Federal Deposit Insurance Corporation ("FDIC"), was headquartered in New York, New York and was a New York State chartered bank. From in or about June 2004 until in or about October 2009, Charles J. Antonucci, Sr. ("Antonucci"), was President and Chief Executive Officer ("CEO") of Park Avenue Bank.   At all times relevant to this Information, Matthew L. Morris was a Senior Vice President at Park Avenue Bank.   During various times relevant to this Information, WILBUR ANTHONY HUFF, the defendant, maintained at least 22 bank accounts at Park Avenue Bank, through which he

2

controlled the finances of the HUFF-Controlled Entities and orchestrated his schemes to defraud. Morris managed Park Avenue Bank's relationships with HUFF and the HUFF-Controlled Entities, and was the bank's primary liaison for banking transactions related to the bank accounts for the HUFF-Controlled entities.

5.      At all times relevant to this Information, Allen Reichman was an Executive Director of Investments at an investment bank and financial services company (the "Investment Firm") headquartered in New York, New York.

### OVERVIEW OF THE DEFENDANT'S ILLEGAL SCHEMES

6.      Between in or about 2007 and in or about 2010, WILBUR ANTHONY HUFF, the defendant, orchestrated interrelated schemes to defraud, through which he unlawfully took and received tens of millions of dollars from clients, active businesses and financial institutions, and used these funds to benefit himself, his family and other companies and accounts in which he had interests and obligations.   Integral to the success of these fraudulent schemes was HUFF's corrupt relationship with Park Avenue Bank executives Morris and Antonucci.   As set forth in this Information, HUFF engaged in the following illegal schemes:

a.      <u>Fraud on O2HR Clients and the IRS</u>: As set forth in Counts One, Two and Three, from in or about 2008 until in or about 2010, HUFF defrauded O2HR and its clients in excess of $53,000,000 in funds that had been provided to O2HR to cover tax obligations, and $5,000,000 in funds provide to O2HR to cover insurance obligations, which O2HR had contracted to pay to the Internal Revenue Service ("IRS") and others on O2HR's clients' behalf. HUFF, however, directed that these funds be paid to himself and other interests, many of which were completely unrelated to O2HR.

3

      b.      <u>Bribery of Morris and Antonucci, Fraud on Bank Regulators and the</u>
<u>GEE Board of Directors and Shareholders, and the Fraudulent Purchase of Oklahoma Insurance</u>
<u>Company</u>:   As set forth in Count Four, from in or about 2007 up to and including in or about 2010,
HUFF engaged in a multi-faceted conspiracy, in which he schemed to (i) bribe executives of Park
Avenue Bank, (ii) defraud bank regulators and the board and shareholders of a publicly-traded
company and (iii) fraudulently purchase an Oklahoma insurance company.   HUFF paid hundreds
of thousands of dollars in payments and bribes to Morris and Antonucci in exchange for Morris
and Antonucci providing favorable treatment at Park Avenue Bank, including, but not limited to,
causing the bank to issue fraudulent letters of credit for $1,750,000, allowing the
HUFF-Controlled Entities to accrue overdrafts in excess of $9,000,000, facilitating intra-bank
transfers in furtherance of HUFF's frauds, and fraudulently causing Park Avenue Bank to issue at
least approximately $4,500,000 in loans to HUFF-Controlled Entities.   Huff also conspired with
Morris and Antonucci, in an effort to bolster Park Avenue Bank's capital, by orchestrating a series
of fraudulent transactions to make it appear that Park Avenue Bank had received an outside
infusion of $6,500,000, and engaged in a series of further fraudulent actions to conceal from bank
regulators the true source of the funds – Park Avenue Bank, itself.   HUFF further conspired with
Morris, Antonucci and Reichman, and others known and unknown to defraud Oklahoma insurance
regulators and others by making material misrepresentations and omissions regarding the source
of $37,500,000 used to purchase Providence Property and Casualty Insurance Company
("Providence P&C"), an Oklahoma insurance company that provided workers' compensation
insurance for O2HR's clients.

<u>THE FRAUD ON O2HR CLIENTS AND THE IRS: BACKGROUND</u>

      7.      The IRS is an agency of the United States Department of Treasury,

4

responsible for administering and enforcing the tax laws of the United States, and collecting the taxes that are due and owing to the Treasury of the United States by its citizens and businesses. One type of taxes, commonly referred to as employment taxes, includes the following:

a.  Federal Income Tax Withholding ("withholding taxes"):  In general, an employer must deduct and withhold income tax on the amount of wages it paid to its employees, and pay over those amounts to the IRS.

b.  Federal Insurance Contribution Act taxes ("FICA taxes"):  The FICA tax is comprised of two elements: old-age, survivor and disability insurance, which is commonly referred to as "Social Security," and health insurance, which is commonly referred to as "Medicare."  Social Security taxes are used to fund retirement and disability benefits, while Medicare taxes are used to provide health and medical benefits for the aged and disabled.  FICA tax payments are made up of the employer's and employee's equal shares of: (i) 6.2% of wages towards Social Security, and (ii) 1.45% towards Medicare, totaling 15.3% of wages.

8.  From in or about 2005 up to and including in or about January 2010, O2HR was a professional employer organization ("PEO") headquartered in Tampa, Florida.  O2HR, like other PEOs, provided outsourced management of the payroll, tax and workers' compensation insurance obligations of client companies, including the collection and remittance of employment taxes.  In contracts with its client companies, O2HR specifically agreed to "make the appropriate payroll deductions and collection of taxes, file the appropriate reports and make payment to proper governmental authorities for federal, state and local income taxes, Social Security tax, federal and state unemployment insurance taxes and any other federal or state tax."  In addition, in many contracts, O2HR agreed to secure workers' compensation insurance coverage for client company employees, where such insurance coverage was required by law.

5

9.    For each pay period and in response to invoices sent by O2HR, its clients paid a lump sum to O2HR that included funds to cover employee gross wages, tax and workers' compensation insurance obligations, and a fee for the services provided by O2HR, as detailed in the invoices.   In 2008 and 2009, the majority of these payments were sent by electronic funds transfers from client companies located throughout the country, including in Florida, New Jersey and Minnesota, to bank accounts at Park Avenue Bank in New York, New York.

10.    Among the tax services O2HR provided to its clients was the preparation of Employer's Quarterly Federal Tax Returns – IRS Forms 941 – which, pursuant to the Internal Revenue Code and relevant regulations, employers were required to file with the IRS on a quarterly basis.   Among other things, Forms 941 reported the total wages paid by an employer to its employees during the relevant reporting period, as well as the amounts owed to the IRS for withholding and FICA taxes.

11.    In addition to preparing and submitting Forms 941 for its clients, O2HR also contracted to remit to the IRS the employment taxes of its clients.   Payments for these taxes were to be, and were in fact, paid to O2HR by its client companies.

12.    Although there were slight variations in the manner by which O2HR provided payroll services for its corporate clients, O2HR typically carried out those services in the following manner:

a.    First, using data provided by the client regarding the hours worked by their employees during a particular pay period, one or more O2HR employees prepared an invoice for the client setting forth the gross wages for each employee, the employer's contributions for employment taxes and workers' compensation insurance, and O2HR's fee.   O2HR then transmitted the invoice to the client, by fax or electronic mail.

6

b.      The client company then reviewed the invoice and remitted payment by: (i) wiring funds to bank accounts maintained by the Oxygen Entities at Park Avenue Bank and other banks; (ii) sending funds via Automated Clearing House ("ACH") transfers to accounts maintained by the Oxygen Entities at Park Avenue Bank and other banks; or (iii) mailing checks to O2HR's offices in Florida.

c.      O2HR sent to the client company, by overnight mail, physical paychecks or direct deposit receipts for that pay period's payroll.   With these checks or receipts, O2HR also sent reports indicating, among other things, (i) the amount of money it withheld from each employee's paycheck for employment taxes, which O2HR was obligated to pay over to the IRS, and (ii) the amount paid to O2HR by the client company to cover the cost of workers' compensation insurance.

13.     From at least in or about 2006 up to and including in or about 2010, WILBUR ANTHONY HUFF, the defendant, covertly controlled O2HR and its finances.   By design, HUFF had no official position at O2HR.   Rather, he installed individuals over whom he exerted control, including a chief executive officer ("CEO") ("CC-1"), to run O2HR's daily operations.   At all times relevant to this Information, however, HUFF controlled O2HR's finances, including millions of dollars held in bank accounts maintained at Park Avenue Bank. HUFF controlled these finances not only through the CEO, but also through HUFF's administrative assistant ("HUFF's Assistant"), who had primary signing authority over almost all of the HUFF-Controlled Entities' bank accounts.   Pursuant to HUFF's directive, HUFF's Assistant needed HUFF's authorization for any significant expenditure, including but not limited to, the payment of tax and insurance obligations on behalf of O2HR's clients.

7

THE SCHEME TO DEFRAUD

14.     From at least in or about 2008 up to and including in or about 2010,

WILBUR ANTHONY HUFF, the defendant, through his covert control of O2HR and its finances,

devised and engaged in a scheme to defraud O2HR's clients and the IRS.   HUFF stole and

converted to his own and other uses tens of millions of dollars from O2HR's clients that had been

entrusted to O2HR to satisfy the clients' employment tax and insurance obligations.   Despite

collecting from its clients funds sufficient to cover their tax and workers' compensation insurance

obligations in 2008 and 2009, because of HUFF's fraudulent scheme, O2HR failed to pay in excess

of $58,000,000 due to the IRS and to Providence P&C, an insurance provider.

15.     Among the means and methods by which HUFF carried out the scheme

were the following:

        a.      From in or about 2008 up to and including in or about 2009, O2HR's

clients sent funds to O2HR to cover their employment tax liabilities in response to invoices from

O2HR.   Instead of paying those funds over to the IRS, as O2HR had represented in its contracts

and invoices that it would do, WILBUR ANTHONY HUFF, the defendant, directed O2HR

employees to delay and ultimately stop making payments to the IRS on behalf of O2HR's clients.

HUFF further directed O2HR employees to file at least one IRS Form 941 that falsely understated

O2HR's tax obligation and further directed O2HR employees not to file other IRS Forms 941.

        b.      Similarly, in 2008 and 2009, O2HR's clients sent funds to O2HR to

cover their workers' compensation obligations, in response to invoices from O2HR.   Instead of

paying the insurance obligations in full for these clients, as O2HR had represented in its contracts

and invoices that it would do, HUFF failed to make millions of dollars in payments to Providence

P&C, the relevant insurance provider.

8

16.    Through this scheme to defraud, WILBUR ANTHONY HUFF, the defendant, caused O2HR to fail to pay the IRS approximately $53,000,000 in employment taxes, and deceived O2HR's clients into believing that their tax obligations had been paid in full.    HUFF further caused O2HR and related companies to fail to pay in excess of $5,000,000 in insurance-related obligations to Providence P&C.    Instead of using O2HR clients' funds to pay their tax and insurance obligations, over the course of the scheme HUFF diverted this money from O2HR to various accounts that HUFF controlled (the "HUFF-Controlled Accounts"), and the money was then used for other purposes, much of which were completely unrelated to O2HR. For example, HUFF diverted millions of dollars of O2HR funds to his investments in unrelated business ventures and to pay for the personal expenses of HUFF and HUFF's family members, including mortgages on properties that had no connection to O2HR, such as HUFF's homes, rent payments for HUFF's children's apartments, vacations, staff and equipment for HUFF's farm, designer clothing, jewelry and luxury cars.

### STATUTORY ALLEGATION

17.    From at least in or about 2008 up to and including in or about 2010, in the Southern District of New York and elsewhere, WILBUR ANTHONY HUFF, the defendant, did corruptly obstruct and impede, and endeavor to obstruct and impede, the due administration of the Internal Revenue Service laws, resulting in O2HR's failure to pay $53,094,219 to the IRS in employment tax obligations of its clients by, among other things:

  a.    Causing employees of O2HR to file at least one false Form 941;

  b.    Causing employees of O2HR to stop filing Forms 941 with the IRS;

  c.    Causing employees of O2HR to stop making payments to the IRS for employment taxes due and owing that O2HR collected from its clients;

9

     d.  Causing the diversion of money received by O2HR from its clients for the payment of employment taxes to other HUFF-Controlled Entities and to HUFF's own personal use;

     e.  Causing the concealment from O2HR's clients of the fact that O2HR failed to pay over a substantial portion of the employment taxes that clients remitted to O2HR in satisfaction of their tax obligations; and

     f.  Concealing HUFF's interest in and control over O2HR by employing various nominee individuals and entities, which HUFF controlled.

(Title 26, United States Code, Section 7212(a).)

### COUNT TWO
**(Aiding and Assisting the Preparation and Presentation of False and Fraudulent Tax Returns)**

The United States Attorney further charges:

18.    The allegations contained in paragraphs 1 through 16 above are hereby repeated, realleged, and incorporated by reference as if fully set forth herein.

19.    On or about the dates set forth below, in the Southern District of New York and elsewhere, WILBUR ANTHONY HUFF, the defendant, did knowingly and willfully aid and assist in, and procure, counsel, and advise the preparation and presentation to the Internal Revenue Service, of Employer's Quarterly Federal Tax Returns, Forms 941, on behalf of O2HR and O2HR's clients, for the quarters hereinafter specified, which were false and fraudulent as to material matters, in that these Forms 941 underreported the total employment taxes due and owing to the United States, whereas, as the defendant then and there well knew and believed, the employment taxes due were substantially higher than the amounts reported:

10

| Year - Quarter | Approximate Tax Due | Approximate Tax Paid | Approximate Taxes Due and Owing |
|---|---|---|---|
| 2008 - 4th | $29,726,433 | $19,543,215 | $10,183,218 |
| 2009 - 1st | $17,075,540 | $10,961,356 | $6,114,184 |

(Title 26, United States Code, Section 7206(2).)

<u>**COUNT THREE**</u>
**(Failure to Pay Taxes)**

The United States Attorney further charges:

20.    The allegations contained in paragraphs 1 through 16 above are hereby repeated, realleged, and incorporated by reference as if fully set forth herein.

21.    On or about the dates set forth below, in the Southern District of New York and elsewhere, WILBUR ANTHONY HUFF, the defendant, did knowingly and willfully fail to pay, and cause O2HR's client companies to fail to pay, to the Internal Revenue Service, certain of the federal income taxes withheld and FICA taxes due and owing to the United States, each company being required to truthfully withhold, account for, and pay over said taxes to the IRS, for each of the following quarters:

| Year - Quarter | Approximate Due Date of Taxes |
|----------------|-------------------------------|
| 2008 - 4th     | January 31, 2009              |
| 2009 - 1st     | April 30, 2009                |
| 2009 - 2nd     | July 31, 2009                 |
| 2009 - 3rd     | October 31, 2009              |
| 2009 - 4th     | January 31, 2010              |

(Title 26, United States Code, Section 7203; Title 18, United States Code, Section 2.)

## COUNT FOUR
### (Conspiracy to Commit Bank Bribery, to Commit Fraud on Bank Regulators and Others and to Fraudulently Purchase an Oklahoma Insurance Company)

The United States Attorney further charges:

22.     The allegations contained in paragraphs 1 through 16 above are hereby repeated, realleged, and incorporated by reference as if fully set forth herein.

23.     As described in more detail below, from in or about 2007 up to and including in or about 2010, HUFF engaged in a multi-faceted conspiracy, in which he schemed to (i) bribe executives of Park Avenue Bank, (ii) defraud bank regulators and the board and shareholders of a publicly-traded company and (iii) fraudulently purchase an Oklahoma insurance

12

company. HUFF paid hundreds of thousands of dollars in payments and bribes to Morris and

Antonucci, in exchange for Morris and Antonucci providing favorable treatment at Park Avenue

Bank. As part of the corrupt relationship between HUFF and these bank executives, facilitated by

HUFF's bribes, HUFF, Morris, Antonucci and others conspired to defraud various entities and

regulators during the relevant time period. Specifically, Huff conspired with Morris and

Antonucci, in an effort to bolster Park Avenue Bank's capital, by orchestrating a series of

fraudulent transactions to make it appear that Park Avenue Bank had received an outside infusion

of $6,500,000, and engaged in a series of further fraudulent actions to conceal from bank

regulators the true source of the funds – Park Avenue Bank, itself. HUFF further conspired with

Morris, Antonucci and Reichman, and others known and unknown to defraud Oklahoma insurance

regulators and others by making material misrepresentations and omissions regarding the source

of $37,500,000 used to purchase Providence Property and Casualty Insurance Company

("Providence P&C"), an Oklahoma insurance company that provided workers' compensation

insurance for O2HR's clients, and to whom O2HR owed a significant debt.

### HUFF'S BRIBERY OF ANTONUCCI AND MORRIS

24.     From at least in or about 2008 up to and including in or about 2009,

WILBUR ANTHONY HUFF, the defendant, provided at least approximately $400,000 and other

benefits, to Morris and Antonucci in an effort to corruptly influence and obtain favorable treatment

from these bank executives in connection with HUFF's banking relationship at Park Avenue Bank.

Specifically, in exchange for these payments and benefits, Morris and Antonucci, among other

things (i) provided, at HUFF's request, two fraudulent letters of credit totaling $1,750,000; (ii)

allowed the HUFF-Controlled Entities to accrue in excess of $9,000,000 in overdrafts; (iii)

facilitated intra-bank transfers in furtherance of HUFF's frauds; and (iv) fraudulently approved

millions of dollars in loans to HUFF-Controlled Entities.

### Fraudulent Letters of Credit

25.     In or about June 2008, WILBUR ANTHONY HUFF, the defendant, paid

Morris and Antonucci approximately $350,000 in exchange for, among other things, providing

fraudulent letters of credit for $1,750,000 from Park Avenue Bank to aid HUFF in obtaining a

significant investment in one of the HUFF-Controlled Entities.   At HUFF's direction, and without

thoroughly evaluating the investment, Antonucci advised an outside investor ("Investor-1"), in

sum and substance, that a proposed $1,750,000 investment in a HUFF-Controlled Entity was

sound.   Then, on or about July 7, 2008, again at HUFF's direction, Morris and Antonucci prepared

two Park Avenue Bank letters of credit obligating Park Avenue Bank to repay Investor-1 if HUFF

failed to repay the investment principal by in or about July 2013 (the "Letters of Credit").   Park

Avenue Bank received no security in exchange for providing the Letters of Credit nor was there

any other economic justification for Park Avenue Bank providing the Letters of Credit.   On or

about July 17 and July 18, 2008, Investor-1 paid HUFF approximately $1,750,000, in part because

Investor-1 believed his investment was fully protected by the Letters of Credit.   At HUFF's

direction, the $1,750,000 was deposited in an account that HUFF controlled at Park Avenue Bank

("Account-1").

26.     At or around the same time, HUFF sent an electronic mail message to

Antonucci thanking him for "all you do for our company and me" and that Antonucci's help was

"very much needed and appreciated."

27.     With Investor-1's money in hand, WILBUR ANTHONY HUFF, the

defendant, used a portion of this investment to make bribe payments to Morris and Antonucci.

On or about July 18, 2008, the same day that Investor-1 provided HUFF with his investment,

HUFF directed that a cashier's check in the amount of $350,000 (the "$350,000 Check") be written with funds from Account-1 to an associate of Morris ("W-1").   Morris and Antonucci subsequently received this $350,000, as set forth below:

> a.   On or about July 18, 2008, upon receiving the check, W-1 deposited it in his account at a bank in New York, New York.

> b.   On or about July 25, 2008, at Morris's direction, W-1 withdrew $250,000 in United States currency from the same account in which he deposited the $350,000 Check and provided the money to Morris.

> c.   Morris subsequently provided approximately $250,000 in United States currency to Antonucci.

> d.   In addition, for the next several months, W-1 made periodic payments to and for the benefit of Morris in a total amount of approximately $100,000, including paying approximately $52,000 towards Morris's credit card and other debt, $15,000 to Morris's partner in a purported business venture unrelated to Park Avenue Bank, and another approximately $30,000 in United States currency to Morris directly.

Overdrafts

28.   WILBUR ANTHONY HUFF, the defendant, managed his illegal schemes through at least 22 accounts maintained in the names of HUFF-Controlled Entities at Park Avenue Bank (the "HUFF Accounts").   In violation of Park Avenue Bank policy, Morris and Antonucci allowed HUFF to freely overdraw the HUFF Accounts in amounts totaling in excess of $9,000,000 at Park Avenue Bank.   These overdrafts were millions of dollars more than other bank customers were typically allowed.   Morris and Antonucci approved these overdrafts despite the fact that Park Avenue Bank suffered from low capital levels.

15

Intra-Bank Transfers

29.     In addition, from in or about 2007 up to and including in or about 2009,

WILBUR ANTHONY HUFF, the defendant, directed a large number of intra-account transfers

between the HUFF Accounts and commingled money among seemingly unrelated companies, a

practice that had brought scrutiny from bank officials at banks where HUFF previously controlled

accounts, and had ultimately resulted in HUFF being forced to close accounts at those banks.   At

Park Avenue Bank, however, Morris, a Senior Vice President, facilitated these types of

transactions for HUFF.

$4.5 Million in Loans

30.     In or about March 2009, in exchange for the payments and other benefits

provided by WILBUR ANTHONY HUFF, the defendant, Antonucci assisted HUFF in

fraudulently obtaining at least approximately $4,500,000 in loans.   As set forth below, HUFF and

Antonucci devised and engaged in a scheme to defraud Park Avenue Bank and bank regulators by

circumventing Park Avenue Bank's review procedures for loans exceeding $1,500,000 and by

submitting loan applications containing false and fraudulent statements (the "Loan Applications"):

        a.      Park Avenue Bank policy required loan applications seeking more

than $1,500,000 to be submitted to the Board of Directors for approval.   At or around the time

Park Avenue Bank issued the $4,500,000 in loans, in or about March 2009, the HUFF-Controlled

Entities owed Park Avenue Bank at least approximately $9,000,000 as a result of overdrafts, as

discussed above in paragraph 28.   These excessive overdrafts and other regulatory concerns

would have prevented Park Avenue Bank's Board of Directors from approving additional debt to

any HUFF-Controlled Entity during the relevant time period.   Antonucci, however, had the power

to approve any loan of $1,500,000 or less.   Thus, to circumvent review of the Loan Applications

16

by the bank's Board, Antonucci and HUFF devised a scheme to submit applications for three loans of $1,500,000 each, totaling $4,500,000, to three different HUFF-Controlled Entities.

        b.      Although WILBUR ANTHONY HUFF, the defendant, and Antonucci fraudulently circumvented Park Avenue Bank's policy, HUFF and Antonucci further agreed that HUFF would submit false and fraudulent application documents to make the loans appear to be legitimate should the Board or bank regulators later review the transactions.   The Loan Applications: (i) falsely stated that the $4,500,000 sought by the HUFF-Controlled Entities was for working capital for those companies; and (ii) vastly overstated the assets and net worth of certain guarantors for the loans.   In truth and in fact, and as HUFF well knew, (i) the loan proceeds would be, and in fact were, immediately transferred to other Park Avenue Bank accounts controlled by HUFF and were used to pay down the approximately $9,000,000 in overdrafts accrued by other HUFF-Controlled Entities at the bank; and (ii) the guarantors for the loans had significantly less assets than stated in the Loan Applications.

        c.      For example, in support of HUFF's application for a $1,500,000 loan to Alexander & Alexander Risk Services, LLC ("Alexander"), a HUFF-Controlled Entity, HUFF's long-time administrative assistant ("HUFF's Assistant") was listed as the guarantor of the loan.   The application included HUFF's Assistant's personal financial statement, which, at HUFF's direction, stated that HUFF's Assistant held a 99 percent ownership in Alexander and had total purported assets of approximately $2,500,000.   In truth and in fact, and as HUFF and Antonucci well knew, HUFF's Assistant was an owner of Alexander in name only; HUFF had complete control over Alexander.   Furthermore, at the time of the loan application, HUFF's Assistant did not have any significant assets, much less the $2,500,000 listed in the application submitted to Park Avenue Bank.

d.      After WILBUR ANTHONY HUFF, the defendant, submitted the Loan Applications, Antonucci approved all three of the loans without the Board of Directors' approval and, as described above, HUFF used the $4,500,000 in proceeds to pay down overdrafts for other HUFF-Controlled Entities.

## FRAUD ON BANK REGULATORS

31.      At all times relevant to this Information, USIG was a Tennessee-based insurance broker.   In or about 2008, WILBUR ANTHONY HUFF, the defendant, induced USIG's owners to give HUFF control over a USIG account at Park Avenue Bank.

32.      At all times relevant to this Information, GEE was a publicly-traded temporary staffing company, headquartered in Illinois.   In or about July 2009, an attorney who had represented HUFF, a co-conspirator not named herein ("CC-2"), purchased the majority of GEE shares for approximately $1,900,000.   HUFF-Controlled Entities provided the entire $1,900,000 that CC-2 used to purchase the GEE shares.   Subsequently, GEE appointed HUFF's business associate, another co-conspirator not named herein ("CC-3"), to be its CEO.

33.      At all times relevant to this Information, Park Avenue Bank was subject to the banking laws and regulations of the FDIC, and of the agency then known as the New York State Banking Department ("NYSBD"), and was accordingly required to maintain certain levels of capital on deposit sufficient to cover potential obligations.   Regulators typically rated Park Avenue Bank and other banks as "well-capitalized," "adequately capitalized," or "undercapitalized."   Banks that were "adequately capitalized" were required to obtain permission from the regulators to engage in certain banking transactions.   Banks that were "undercapitalized" were prohibited from engaging in certain types of banking transactions, and were subject to a range of potential enforcement actions by regulators.

18

34.     On or about August 20, 2008, the FDIC informed Park Avenue Bank's Board of Directors that, as of March 31, 2008, the bank was merely "adequately capitalized," and accordingly imposed certain restrictions.   By in or about October 2008, the bank's capital situation had worsened to the point that the bank was in danger of becoming "undercapitalized."

35.     Beginning in or about September and October 2008, and continuing until in or about 2009, WILBUR ANTHONY HUFF, the defendant, Morris, Antonucci and others known and unknown, engaged in a scheme to make the bank appear more capitalized in an effort to prevent it from being deemed "undercapitalized."   HUFF, Morris and Antonucci first defrauded bank regulators by arranging for, and executing, the transfer of $6,500,000 of Park Avenue Bank's own funds to Antonucci, which Antonucci then used and publicly claimed as a personal investment in the bank (the "Round-Trip Transaction").   HUFF, Morris and Antonucci subsequently defrauded bank regulators by making, and directing others to make, false statements and false and fraudulent documents to continue to deceive regulators about the true source of the funds used for Antonucci's purported investment.   Finally, in another effort to conceal the true source of a portion of the Round-Trip Transaction funds, HUFF, Morris and Antonucci took, without authorization, nearly all of GEE's working capital, and defrauded GEE's Board of Directors, outside auditors and shareholders by falsely claiming that GEE's money was being held for GEE's benefit in a Park Avenue Bank certificate of deposit.

<u>The Round-Trip Transaction</u>

36.     In or around October 2008, Antonucci made a purported personal investment in Park Avenue Bank and emphasized to the FDIC that his substantial investment should be favorably considered (i) as stabilizing the bank's capitalization problems, (ii) to permit the bank to engage in certain banking transactions that it would otherwise be prohibited from

engaging in, and (iii) in evaluating the bank's application for funds distributed through the United States Treasury Department's Troubled Asset Relief Program ("TARP").

37.     Antonucci's purported $6,500,000 investment was critical to Park Avenue Bank because it helped the bank maintain what appeared to be sufficient capital and, consequently, helped the bank to remain in compliance with federal and state banking regulations.   The investment was also critical to HUFF ensuring that he would continue to benefit from his corrupt relationship with Park Avenue Bank executives.   In fact, on or about July 6, 2010, in reference to the Round Trip Transaction, HUFF told an associate, in sum and substance, that HUFF had a vested interest in helping Antonucci "shore up" the bank because HUFF was using the bank for his own interests.

38.     Shortly after the Round-Trip Transaction, in or about November 2008, in an effort to secure additional capital, Park Avenue Bank applied for approximately $11,352,480 from TARP, including in the application a reference to Antonucci's purported $6,500,000 investment.

39.     In truth and in fact, however, and as WILBUR ANTHONY HUFF, defendant, Morris and Antonucci well knew, the $6,500,000 that Antonucci purportedly invested in Park Avenue Bank was not an independent investment in the bank, but rather was money Park Avenue Bank controlled and that HUFF, Morris and Antonucci disguised to appear to be an independent investment.   Through a series of deceptive, round-trip transactions, existing Park Avenue Bank funds were disguised as loans to HUFF-Controlled Entities, including USIG, and transferred, at HUFF's and Morris's direction, into Park Avenue Bank accounts maintained by these entities; the funds were then transferred from the HUFF-Controlled Entities to Antonucci; and finally, Antonucci transferred the funds back to Park Avenue Bank as a purported personal investment in the bank.

20

Concealment of Round-Trip Transaction
from Regulators and Others

40.     Following the Round-Trip Transaction, WILBUR ANTHONY HUFF, the

defendant, Morris, and Antonucci continued to defraud regulators by making false statements and

taking other steps to hide the true, illicit nature of the Round-Trip Transaction.   Among other

things, HUFF created or directed the creation of false documents to make it appear to regulators

that Antonucci had an independent source of funds for his purported investment.   Specifically, in

or about October 2009, HUFF engaged attorneys in Louisville, Kentucky to draft false, fraudulent

and backdated agreements in an effort to deceive the FDIC into believing that Antonucci earned

the $6,500,000 by selling to CC-2 an interest in Bedford Consulting Group ("Bedford"), a small

company owned by Antonucci.   In truth and in fact, and as HUFF well knew, no such sale of

Bedford occurred and, in any event, Bedford had little or no value in or about 2008 and 2009.

41.     In addition, in or about April 2009, WILBUR ANTHONY HUFF, the

defendant, Morris and Antonucci further concealed the Round-Trip Transaction by stealing money

from GEE.   Because Park Avenue Bank used a $2,300,000 loan to USIG to execute part of the

Round Trip Transaction, USIG technically owed the bank $2,300,000 for that loan – a fact that

was in danger of being discovered because USIG had filed for bankruptcy and was therefore under

increased scrutiny.   To enable USIG to pay back the loan, HUFF stole $2,300,000 – the majority

of GEE's working capital – from GEE as follows:

a.     On or about July 21, 2009, HUFF and Morris caused GEE's CEO,

CC-3, to authorize the transfer of $2,300,000 from a GEE bank account to purportedly purchase a

certificate of deposit at Park Avenue Bank.   Morris authorized the transaction at Park Avenue

Bank.   The transfer, however, violated GEE's investment policy and, in any event, GEE never

21

purchased a certificate of deposit from the bank.   In truth and in fact, and as HUFF and Morris well knew, the $2,300,000 from GEE was used not to buy a certificate of deposit, but to reimburse Park Avenue Bank for the outstanding $2,300,000 loan to USIG.   As HUFF and Morris were aware, failure to satisfy USIG's debt would have attracted unwanted scrutiny of the loan by regulators and others, and consequently, scrutiny of their involvement in the fraudulent Round-Trip Transaction.

        b.      To hide the improper diversion of GEE's funds from GEE's auditors, Board of Directors and shareholders, WILBUR ANTHONY HUFF, the defendant, Morris, Antonucci and others known and unknown created a counterfeit receipt for a certificate of deposit, which falsely represented that GEE's $2,300,000 had been invested in a 90-day certificate of deposit at Park Avenue Bank.   In or about November and December 2009, when GEE's Audit Committee and outside auditors identified the missing $2,300,000, HUFF caused approximately $2,300,000 to be transferred to GEE's bank account from other, unrelated HUFF-Controlled Entities, including SDH Realty and the Oxygen and River Falls Entities.   A large portion of this $2,300,000 transferred to GEE was money that O2HR collected from its clients for their employment tax and other obligations, but which HUFF diverted to other HUFF-Controlled Entities, including SDH and the Oxygen and River Falls Entities, and ultimately to GEE.

        42.      In or about 2010, WILBUR ANTHONY HUFF, the defendant, appeared at Park Avenue Bank's headquarters in New York, New York, and unsuccessfully attempted to submit the fake CD receipt in exchange for $2,300,000.

<u>FRAUDULENT PURCHASE OF OKLAHOMA INSURANCE COMPANY</u>

        43.      At all times relevant to this Information, Providence P&C was an insurance company licensed in Oklahoma and which maintained its primary office in Addison, Texas.

22

Providence P&C was licensed by the Oklahoma Insurance Department ("OID"), which regulated

various practices of Oklahoma insurance companies.   Under the OID's regulations and applicable

Oklahoma law, Providence P&C was required to maintain a certain amount of surplus to ensure

that adequate funds were on hand to pay policyholders' claims and anticipated claims.

      44.     WILBUR ANTHONY HUFF, the defendant, through O2HR and other

PEOs, purchased workers' compensation insurance from Providence P&C.   As of in or about

January 2009, HUFF-controlled PEOs owed in excess of $5,000,000 to Providence P&C as a

result of HUFF's failure to pay the insurance obligations of the PEO companies' clients, as

described in Count One of this Information.

<u>The Fraudulent $37.5 Million Purchase of Providence P&C</u>

      45.     In or about September 2009, WILBUR ANTHONY HUFF, the defendant,

and Antonucci devised a scheme in which Antonucci would purchase Providence P&C for

$37,500,000.   Antonucci subsequently created a company, Park Avenue Insurance, LLC ("Park

Avenue Insurance"), to purchase Providence P&C and to serve as a holding company for the

operating insurance entity.

      46.     To finance the purchase, WILBUR ANTHONY HUFF, the defendant, and

Antonucci sought the assistance of Allen Reichman, who was an Executive Director of

Investments at the Investment Firm.   Reichman subsequently agreed with HUFF, Antonucci and

others known and unknown, to cause the Investment Firm to loan at least approximately

$30,000,000 to Park Avenue Insurance to purchase Providence P&C (the "$30,000,000 Loan"),

using Providence P&C's assets as collateral for the loan, which HUFF and Reichman knew was

unlawful.   Indeed, after being approached by HUFF and Antonucci regarding the loan,

Investment Firm executives and others warned Reichman on several occasions that using

23

Providence P&C's assets as collateral for the loan was illegal and that he should not cause the loan to be issued.   On or about January 28, 2009, in an effort to deceive executives at the Investment Firm into believing that the Investment Firm could legally issue the $30,000,000 Loan, Reichman directed Antonucci to sign a letter that provided false information regarding the collateral that would be used for the loan.   Despite the warnings from Investment Firm executives and others, and Reichman's knowledge that the loan was in fact illegal, on or about January 30, 2009, Reichman caused the Investment Firm to issue the $30,000,000 Loan to Park Avenue Insurance.

47.   Because Providence P&C was an Oklahoma insurance company, Oklahoma state law required that the OID approve its sale to Park Avenue Insurance.   To secure this approval, WILBUR ANTHONY HUFF, the defendant, Antonucci, and their representatives, including CC-2, concealed from the OID the true source of the transaction's funding - a loan from the Investment Firm - and instead falsely represented to the OID that Park Avenue Bank was funding the purchase.   In furtherance of this false statement, in or about October 2008, Morris created and provided to the OID a letter that falsely stated that Park Avenue Bank was funding Park Avenue Insurance's $37,500,000 purchase of Providence P&C.   In truth and in fact, and as Morris well knew, none of the funding for the acquisition came from Park Avenue Bank.   Rather, the majority of the $37,500,000 that Park Avenue Insurance used to purchase Providence P&C came from the illegal $30,000,000 Loan.   The remaining $7,500,000 came from other Providence P&C assets, which was another aspect of the transaction withheld from the OID by Antonucci's representatives.

48.   On or about January 29, 2009, the OID approved the sale based on the false and fraudulent representations by Antonucci's representatives and Morris.   On or about January 30, 2009, at the Park Avenue Bank in New York, New York, Park Avenue Insurance purchased

24

Providence P&C's assets in exchange for $37,500,000, $30,000,000 of which came from the illegal loan from the Investment Firm.

49.     WILBUR ANTHONY HUFF, the defendant, and Allen Reichman each benefitted financially from this scheme to defraud, as set forth below:

a.      Immediately after Park Avenue Insurance acquired Providence P&C's assets, HUFF, Morris, and Antonucci took millions of dollars from Park Avenue Insurance for themselves and for businesses that had no relation to the insurance company.   Specifically, among other payments: (i) in or about May 2009, Morris and Antonucci each took approximately $500,000 from Park Avenue Insurance for their personal benefit; (ii) from in or about February 2009 up to and including October 30, 2009, Morris received at least approximately $170,000 for purportedly serving as an executive of Park Avenue Insurance, despite having no previous experience in the insurance industry; and (iii) HUFF, with Morris's assistance, took $4,000,000 from Park Avenue Insurance, which HUFF then used to continue his illegal scheme related to O2HR, discussed in Count One of this Information.

b.      Reichman benefitted financially from the Investment Firm's loan to Park Avenue Insurance.   As a prerequisite to authorizing the loan, Reichman required that Providence P&C's approximately $53,000,000 bond portfolio, which included its surplus, be transferred to and maintained at the Investment Firm.   Reichman subsequently received hundreds of thousands of dollars in commissions as a result of these bonds being maintained at the Investment Firm.

50.     In or about November 2009, Park Avenue Insurance's operating insurance company became insolvent and was placed in receivership because, among other things, its assets, including the state-mandated surplus, were encumbered by the $30,000,000 Loan, and because

HUFF, Morris, and Antonucci had pilfered the remaining company assets.   As a result, state insurance guaranty associations will be required to contribute millions of dollars towards satisfying policyholder claims.

STATUTORY ALLEGATIONS

51.    From at least in or about 2007 up to and including in or about 2010, in the Southern District of New York and elsewhere, WILBUR ANTHONY HUFF, the defendant, Morris, Antonucci, and others known and unknown, willfully and knowingly did combine, conspire, confederate, and agree together and with each other to (i) commit bank bribery in violation of Sections 215(a)(1) and (a)(2) of Title 18, United States Code; (ii) defraud bank regulators in violation of Section 1005 of Title 18, United States Code, and defraud the board and shareholders of GEE, in violation of Section 1343 of Title 18, United States Code; and (iii) commit wire fraud in violation of Section 1343 of Title 18, United States Code.

52.    It was a part and an object of the conspiracy that WILBUR ANTHONY HUFF, the defendant, did corruptly give, offer, and promise something of value to persons, with intent to influence and reward such officers, directors, employees and agents of a financial institution in connection with business and transactions of such institution, to wit, HUFF paid hundreds of thousands of dollars to Morris and Antonucci, who were officers at Park Avenue Bank, in exchange for Morris and Antonucci providing HUFF favorable treatment at Park Avenue Bank, including but not limited to, causing the bank to provide fraudulent letters of credit totaling $1,750,000, allowing the HUFF-Controlled Entities to accrue overdrafts in excess of $9,000,000, facilitating intra-bank transfers in furtherance of HUFF's frauds, and fraudulently causing Park Avenue Bank to issue at least approximately $4,500,000 in loans to HUFF-Controlled Entities.

53.    It was further a part and an object of the conspiracy that Morris and

Antonucci, as officers, directors, employees and agents of a financial institution, willfully, knowingly, and corruptly solicited and demanded for their own benefit and for the benefit of other persons, and corruptly accepted and agreed to accept, things of value from persons, to wit, WILBUR ANTHONY HUFF, the defendant, intending to be influenced and rewarded in connection with the business and transactions of such institution.

54.     It was further a part and an object of the conspiracy that WILBUR ANTHONY HUFF, the defendant, Morris and others known and unknown, willfully and knowingly would and did make false entries in books, reports, and statements of an insured bank, and would and did cause false entries in books, reports and statements of an insured bank to be made, with intent to defraud such bank, and individual persons, and to deceive officers of such bank, and the FDIC, and agents and examiners appointed to examine the affairs of such bank, in violation of Title 18, United States Code, Section 1005, to wit, HUFF, Morris and others known and unknown, in an effort to deceive the FDIC and others: (a) orchestrated the transfer of approximately $6,500,000 as part of the Round-Trip Transaction; and (b) caused the creation of false and fraudulent documents, including backdated contracts and a fraudulent Park Avenue Bank certificate of deposit; and (c) made and caused to be made false statements to bank regulators regarding the source of the funds used in the Round-Trip Transaction.

55.     It was further a part and an object of the conspiracy that WILBUR ANTHONY HUFF, the defendant, Antonucci, Morris, Reichman, and others known and unknown, willfully and knowingly, having devised and intending to devise a scheme and artifice to defraud, and for obtaining money and property by means of false and fraudulent pretenses, representations, and promises, would and did transmit and cause to be transmitted by means of wire and radio communication in interstate and foreign commerce, writings, signs, signals,

27

pictures, and sounds for the purpose of executing such scheme and artifice, in violation of Title 18,

United States Code, Section 1343, to wit, HUFF, Morris, Antonucci, Allen Reichman, and others

known and unknown, conspired to defraud (a) the Oklahoma Insurance Department, as well as

state insurance guaranty associations, policyholders, insurance companies and taxpayers, by

making and causing to be made material misrepresentations and omissions regarding the source of

the $37,500,000 used to purchase Providence P&C and (b) the Investment Firm by making and

causing to be made material misrepresentations and omissions regarding the $30,000,000 Loan.

OVERT ACTS

56.     In furtherance of the conspiracy and to effect the illegal objects thereof, the

following overt acts, among others, were committed in the Southern District of New York and

elsewhere:

a.     On or about July 18, 2008, HUFF directed that a cashier's check

from Park Avenue Bank in the amount of $350,000 from Park Avenue Bank in New York, New

York be paid to W-1.

b.     In or about October 2009, HUFF met with Antonucci in New York,

New York, to discuss the FDIC's inquiry in to the Round Trip Transaction.

c.     In or about October 2009, HUFF directed an attorney to draft

fraudulent purchase agreements related to Bedford Consulting Group, which were then provided

to the FDIC.

g.     In or about September 2008, HUFF met with Antonucci at Park

Avenue Bank in New York, New York regarding the acquisition of Providence P&C.

h.     On or about January 30, 2009, Morris caused $37,500,000 to be

transferred by interstate wire from a bank account at Park Avenue Bank in New York, New York

28

to a bank account in Durant, Oklahoma.

(Title 18, United States Code, Section 371.)

## FORFEITURE ALLEGATIONS

57.    As a result of committing the conspiracy to commit bank bribery and to commit fraud on bank regulators offense alleged in Count Four of this Information, WILBUR ANTHONY HUFF, the defendant, shall forfeit to the United States, pursuant to Title 18, United States Code, Section 982(a)(2), any property constituting, or derived from, proceeds obtained, directly or indirectly, as a result of such offense, including, but not limited to (a) at least $10,800,000 in United States currency, in that such sum in aggregate is property representing the amount of proceeds obtained by WILBUR ANTHONY HUFF, the defendant, and others as a result of the offenses, and (B) the following property:

(a)    102 Van Meter St, Clarkson, KY, 42726;

(b)    501 Spring St, Clarkson, KY, 42726;

(c)    Cardwell Road South, Morgantown, KY, 42252;

(d)    389 McClure Cemetery Rd, Leitchfield, KY, 42754;

(e)    707 Oxmoor Woods Parkway, Louisville, KY, 40245;

(f)    Legacy Golf Course. 400 Golf Course Rd, Leitchfield, KY, 42754;

(g)    1829 Dog Creek Rd, Caneyville, KY, 42721;

(h)    11921 Brinley Ave, Louisville, KY, 40243;

(i)    542 Proffitt Rd, Horse Ranch, KY, 42349;

(j)   501 Hardin St, Leitchfield, KY, 42754;

(k)   313 Longview Park Place, Louisville, KY, 40245;

(l)   315 Longview Park Place, Louisville, KY, 40245;

(m)   2629 Elizabethtown Rd, Leitchfield, KY, 42754; and

(n)   402 Morgantown Rd, Caneyville, KY, 42721.

<u>Substitute Asset Provision</u>

58.   If any of the above-described forfeitable property, as a result of any act or omission of the defendant:

(a)   cannot be located upon the exercise of due diligence;

(b)   has been transferred or sold to, or deposited with, a third person;

(c)   has been placed beyond the jurisdiction of the Court;

(d)   has been substantially diminished in value; or

(e)   has been commingled with other property which cannot be subdivided without difficulty;

it is the intent of the United States, pursuant to Title 18, United States Code, Section 982(b) and

Title 21, United States Code, Section 853(p), to seek forfeiture of any other property of said defendant up to the value of the above forfeitable property.

(Title 18, United States Code, Section 982; Title 21 United States Code, Section 853)


PREET BHARARA  NF/JML
United States Attorney

Form No. USA-33s-274 (Ed. 9-25-58)

# UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF NEW YORK

### UNITED STATES OF AMERICA

**- v. -**

### WILBUR ANTHONY HUFF,

**Defendant.**

## <u>INFORMATION</u>

S3 12 Cr. 750 (NRB)

(Title 18, United States Code, Sections 2, 371, and Title 26,
United States Code, Sections
7203, 7206(2) and 7212(a)).

<u>Preet Bharara</u>
United States Attorney.