UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
---------------------------------X
UNITED STATES OF AMERICA,

             – against –

WILBUR ANTHONY HUFF and ALLEN            S2 12 CR. 750 (NRB)
REICHMAN,
                                         **MEMORANDUM AND ORDER**

             Defendants.
---------------------------------X
**NAOMI REICE BUCHWALD**
**UNITED STATES DISTRICT JUDGE**


## BACKGROUND

On November 27, 2012, defendants Huff and Reichman were charged in a thirteen-count indictment (the "Indictment") for counts that included charges of tax, bank, and wire fraud. According to the Indictment, Huff orchestrated several interrelated schemes to defraud, one of which Reichman joined, through which Huff unlawfully appropriated tens of millions of dollars from clients and financial institutions for his own benefit and Reichman benefited from increased commissions.

On September 15, 2014, Huff and Reichman submitted an omnibus pretrial motion in which they challenged the sufficiency of Counts One through Seven and Nine through Thirteen of the Indictment, moved to dismiss several counts as duplicitous or multiplicitous, moved to sever Counts One through Seven, moved to suppress wiretap recordings, moved to strike prejudicial surplusage, and moved for

immediate disclosure of *Brady/Giglio* material and for a bill of particulars.  After submitting an opposition to defendants' motions, the Government filed a superseding indictment that included new allegations with respect to Count Thirteen--the only count with which Reichman was charged.  As a result, defendants withdrew their motion to dismiss Count Thirteen in order to bring a new motion directed to the altered charge, but continued to full briefing of the other motions.

The Court denied or reserved judgment on all the then-pending pretrial motions.  Following our decision, the Government filed a second superseding indictment (the "Superseding Indictment"), which added four tax counts relating solely to Huff and did not substantively alter the allegations in Count Thirteen.  Huff subsequently pled guilty to a superseding information and Reichman renewed his motion to dismiss the now-superseded Count Thirteen. On February 3, 2015, we held oral argument on that motion.

For the reasons set forth herein, the motion is denied.


## DISCUSSION

### I.   Count Thirteen

Count Thirteen of the Superseding Indictment, the allegations of which we accept as true for purposes of the present motion, United States v. Goldberg, 756 F.2d 949, 950 (2d Cir. 1985), charges the defendants with conspiring to purchase Providence P&C,

an Oklahoma licensed insurance company, in contravention of the Oklahoma Insurance Department ("OID") rules.

According to the Superseding Indictment, Huff-controlled entities owed in excess of $5 million to Providence P&C as a result of Huff's involvement in a separate scheme involving the failure to pay over insurance obligations. Id. ¶ 62. Consequently, in or about September 2009, Huff devised a scheme through which he and co-conspirators would purchase Providence P&C through a newly created entity, Park Avenue Insurance, for $37 million. Id. ¶ 63. To finance the acquisition, Huff and co-conspirators sought the assistance of Reichman, an Executive Director at an investment firm ("Oppenheimer"). Id. ¶ 64. Count Thirteen alleges that Reichman agreed to cause Oppenheimer to issue a $30 million loan to Park Avenue Insurance in order to purchase Providence P&C, using Providence P&C's own assets as collateral for the loan. Id. Reichman was allegedly warned by others at Oppenheimer on several occasions that this arrangement was unlawful and was told not to cause the loan to go forward; nevertheless, Reichman directed a co-conspirator to sign a letter providing false information regarding the loan's collateral, enabling and causing the loan to be issued. Id.

Huff and others then sought to purchase Providence P&C using the funds from the loan. However, Oklahoma state law required that the OID approve the purchase, and such approval would not

have been forthcoming given the lack of external funds supporting the loan and sale.  Id. ¶ 65.  Thus, to secure approval, Huff and others concealed from the OID the true source of the transaction's funding--the loan facilitated by Reichman, backed by Providence's own assets--and instead falsely represented to the OID that Park Avenue Bank was funding the purchase.  Id.

After the OID approved the sale and Park Avenue Insurance purchased Providence P&C on or about January 29, 2009, Huff and others allegedly pilfered the assets of the insurance company for personal use.  Id. ¶¶ 66-67.  Reichman is not alleged to have taken part in the looting of Providence P&C, but is alleged to have benefitted from the transaction by causing Providence P&C's $53 million bond portfolio to be transferred to Oppenheimer, from which he was able to receive hundreds of thousands of dollars in commissions.  Id. ¶ 67.

Within ten months, in or about November 2009, the insurance company became insolvent and was placed in receivership, leaving state insurance guaranty associations to contribute millions of dollars toward satisfying policyholder claims.  Id. ¶ 68.  Based on these allegations, among others, Count Thirteen charges Reichman with conspiracy to commit wire fraud in violation 18 U.S.C. §§ 1343, 1349; specifically, it charges Reichman of conspiring with others "to defraud (i) the OID, as well as state insurance guaranty associations, policyholders, insurance companies and taxpayers, by

4

making and causing to be made material misrepresentations and omissions regarding the source of the $37,500,000 used to purchase Providence P&C and (ii) the Investment Firm[, Oppenheimer,] by making and causing to be made material misrepresentations and omissions regarding the $30,000,000 loan." Id. ¶ 69.


## II.  Timeliness

Reichman first seeks to dismiss the Superseding Indictment as untimely.  The Superseding Indictment, which was returned on November 17, 2014, charges a conspiracy that continues into the five-year statutory period, "up to and including in or about November 2009," id. ¶ 69.  Nevertheless, Reichman argues that the Superseding Indictment should be dismissed as facially untimely, as it does not allege an overt act during the five-year period, and/or because it does not sufficiently relate back to the original indictment.

We reject defendant's contention that the Superseding Indictment is facially untimely because it fails to charge an overt act within the limitation period.  Courts have held that the conspiracy statute under which Reichman has been charged--18 U.S.C. § 1349--does not contain an overt-act requirement.  See United States v. Kazarian, 10 Cr. 895 PGG, 2012 WL 1810214, at *24 (S.D.N.Y. May 18, 2012) ("Mirzoyan claims that Count Three, conspiracy to commit bank fraud in violation of 18 U.S.C. § 1349,

is insufficient in that it does not allege an overt act.  Unlike Section 371, Section 1349 contains no overt act requirement, and courts have rejected the argument that such a requirement should be read into the statute."); United States v. Albers, 08 Cr. 819 NG RML, 2011 WL 1225548, at *1 (E.D.N.Y. Mar. 31, 2011) ("In sum, given that the language of § 1349 'does not expressly make the commission of an overt act an element of the conspiracy offense,' . . . there is no requirement that the government prove an overt act on the part of a conspirator as an element of 18 U.S.C. § 1349 conspiracy to commit wire fraud.") (quoting Whitfield v. United States, 543 U.S. 209, 214 (2005)); United States v. Rogers, 769 F.3d 372, 380 (6th Cir. 2014) ("[A] conspiracy under 18 U.S.C. § 1349 does not require proof of an overt act in furtherance of the agreement in order to convict a defendant of the conspiracy offense."); United States v. Chinasa, 489 F. App'x 682, 685-86 (4th Cir. 2012) (same).  As such, Reichman's argument that the Superseding Indictment is untimely for failure to plead an overt act during the period represents (assuming that the superseding indictment does not relate back) essentially an argument addressed to the sufficiency of the evidence at trial--namely, whether the Government can in fact show that the conspiracy continued through the period--and is not a basis for a pretrial motion to dismiss. See, e.g., United States v. Calvente, 12 Cr. 732 WHP, 2013 WL 4038952, at *2 (S.D.N.Y. July 26, 2013) (where relevant conspiracy

statute "does not require proof of an overt act," allegations that conspiracy continued into the statutory period render the indictment "facially valid" and defendants' challenge was one "for insufficient evidence" that "must await a Rule 29 motion or the jury's verdict").

Even assuming that the Government was required to allege an overt act within the limitations period, the Superseding Indictment remains timely because it sufficiently relates back to the original Indictment.  Under the relation-back doctrine, a superseding indictment is timely when it "does not broaden the charges made in the first indictment" and the first indictment is itself timely. United States v. Grady, 544 F.2d 598, 603 (2d Cir. 1976).  "In determining whether a superseding indictment materially broadens or amends the original charges, we will consider whether the additional pleadings allege violations of a different statute, contain different elements, rely on different evidence, or expose the defendant to a potentially greater sentence.  No single factor is determinative; rather, the 'touchstone' of our analysis is notice, i.e., whether the original indictment fairly alerted the defendant to the subsequent charges against him and the time period at issue." United States v. Salmonese, 352 F.3d 608, 622 (2d Cir. 2003).  Thus, courts have found superseding indictments valid where, inter alia, additional overt acts, additional defendants, additional objects of a

conspiracy, and aiding and abetting charges have been added. <u>See,
e.g.,</u> <u>United States v. Salmonese</u>, 352 F.3d 608 (2d Cir. 2003);
<u>United States v. Jackson</u>, 749 F. Supp. 2d 19 (N.D.N.Y. 2010) <u>aff'd,</u>
513 F. App'x 51 (2d Cir. 2013); <u>United States v. Panebianco</u>, 543
F.2d 447 (2d Cir. 1976); <u>United States v. Gengo</u>, 808 F.2d 1 (2d
Cir. 1986).

Here, the original indictment accused Reichman of conspiring,
in violation of 18 U.S.C. §§ 1343, 1349, to defraud the OID; the
Superseding Indictment charges Reichman with the same conspiracy
to defraud the OID, but adds as objects of the conspiracy certain
derivative victims of the fraud on the OID, such as policyholders
and state guaranty associations, and Oppenheimer. Reichman argues
that the Superseding Indictment materially alters the nature of
the charges against him because it accuses him of intending to
obtain new and different property from new and different victims,
requiring him to develop several new theories and defenses and
potentially allowing conviction where the original indictment may
have been found inadequate.

However, the scheme charged in both indictments is exactly
the same, laid out in the same terms over the course of several
pages; the Government's decision to enumerate in a "to wit" clause
in the Superseding Indictment victims implicit in the original
indictment does not mean that the original indictment did not
adequately put the defendant on notice of their existence or of

the fundamental nature of the scheme with which he is now charged. See, e.g., United States v. Gengo, 808 F.2d 1, 4 (2d Cir. 1986) (finding relation-back where superseding indictment added new object of defrauding IRS to conspiracy charge because "the amended conspiracy charge rested on the same factual allegations as the first"); United States v. McMillan, 600 F.3d 434 (5th Cir. 2010) (finding relation-back where the original indictment charged a scheme to defraud by misleading an insurance department and the superseding indictment added as victims the insurance company and insureds, because the court "fail[ed] to see how this [addition] materially altered the charge of the original indictment when the original indictment nowhere alleged that the state insurance department was the source of that money or property" and the "new indictment neither added statutory charges against the defendants nor exposed them to increased punishment" nor "change[d] the facts as to the defendants' underlying conduct that constituted the alleged violations of the statutes"); United States v. Italiano, 894 F.2d 1280, 1285 (11th Cir. 1990) ("[T]he crucial inquiry is whether approximately the same facts were used as the basis of both indictments."). Whether these amendments require additional defenses or enable conviction in a way that the original indictment did not does not render the Superseding Indictment untimely. See, e.g., United States v. Jackson, 749 F. Supp. 2d 19, 25 (N.D.N.Y. 2010) aff'd, 513 F. App'x 51 (2d Cir. 2013) ("The 2009 Indictment

does not expose the defendant to greater penalties, an increased sentence, or even allege new crimes. Defendant's claim that it will somehow be easier for a jury to convict him under the 2009 Indictment than the 2006 Superseding Indictment, even if true, is not enough to find that the charges have been materially broadened or substantially amended."). Reichman's motion to dismiss the Superseding Indictment as untimely is therefore denied.


### III. Sufficiency of the Charge

The issue of whether an Indictment is legally sufficient is addressed in a well-established context. An indictment "need do little more than to track the language of the statute charged and state the time and place (in approximate terms) of the alleged crime." United States v. Stringer, 730 F.3d 120, 124 (2d Cir. 2013) (internal citation and quotation marks omitted). "[A]n indictment is sufficient if it, first, contains the elements of the offense charged and fairly informs a defendant of the charge against which he must defend, and second, enables him to plead an acquittal or conviction in bar of future prosecutions." Hamling v. United States, 418 U.S. 87, 117 (1974) (citations omitted). Indeed, Federal Rule of Criminal Procedure 7(c) merely requires that an Indictment contain "a plain, concise, and definite written statement of the essential facts constituting the offense charged."

To procure a conviction for wire fraud under Section 1343, the Government must prove three elements: (1) a scheme to defraud victims of (2) money or property, through the (3) use of the mails or wires.  United States v. Walker, 191 F.3d 326, 334 (2d Cir. 1999).  Reichman challenges the sufficiency of Count Thirteen on essentially three grounds: (1) that the Government has failed to allege a scheme to deprive the OID of "property"; (2) that the Government has failed to allege a scheme to deprive any cognizable victim of property; and (3) that the Government has failed to adequately allege Reichman's involvement in the scheme and therefore his intent to defraud.  We address each argument in turn.

**A.   The OID**

First, Reichman argues that both the original and superseding indictments fail because they accuse the conspirators of merely deceiving the OID into making a regulatory decision, a product that cannot be construed as "property" under Section 1343.  See, e.g., United States v. Schwartz, 924 F.2d 410, 417 (2d Cir. 1991) (To sustain a conviction for wire fraud, "the government must have been deprived by [defendants'] fraud of some property, whether styled as tangible or intangible.").  In particular, Reichman argues that the OID's approval cannot constitute property because it is not "obtainable," as required by Sekhar v. United States, 133 S. Ct. 2720 (2013) and because it represents a regulatory rather than a property interest, which Cleveland v. United States,

531 U.S. 12 (2000), and Second Circuit case law have found inadequate to support a wire fraud charge.

We find, however, that the OID was plausibly defrauded of a property interest. First, we reject Reichman's argument that property under the wire fraud statute must be "obtainable" in light of the Supreme Court's decision in Sekhar. Sekhar, which held that compelling a person to recommend that his employer approve an investment did not constitute "the obtaining of property from another" as required for extortion under the Hobbs Act, 133 S. Ct. at 2725, turned specifically on the text of the Hobbs Act, which requires the "obtaining of property from another"--a key phrase, with a logical connection to a concern for transferability, that is notably absent from the wire fraud statute at issue here. Similarly, the Court relied on the "genesis of the Hobbs Act [to] reinforce[] th[e] conclusion" that "property extorted [under the Hobbs Act] must therefore be transferable," id., suggesting that extending Sekhar's analysis to a different statute and statutory history would be inappropriate. Moreover, as the Government notes, Reichman's position is difficult to maintain in light of the Second Circuit's recent decision in United States v. Clark, 13 Cr. 922, 2014 WL 6911623, at *1 (2d Cir. Dec. 10, 2014). Although its summary opinion is nonprecedential, the court did uphold a conviction for wire fraud, noting that the defendant's "reliance on Sekhar v. United States, 133 S.Ct. 2720 (2013), is misplaced[

12

because t]here, the Supreme Court analyzed the scope of the concept of 'property' for purposes of the Hobbs Act, not the wire fraud statute."   Id.   Thus, the fact that the OID's approval is not strictly "obtainable" presents no bar to the charge.

Second, we reject Reichman's contention that Cleveland v. United States, 531 U.S. 12 (2000), requires the conclusion that the OID's approval is not a property interest.   In Cleveland, defendants were charged with wire fraud after they submitted a fraudulent video poker license application that concealed their ownership interests in the applying organization as well as its tax and financial problems.   The Court held that Louisiana's interest in the issuance of these licenses was a regulatory rather than property interest, and that "[s]tate and municipal licenses in general, and Louisiana's video poker licenses in particular . . . [therefore] do not rank as 'property'" for the purpose of the wire fraud statute.   Id. at 15.   In particular, the Court rejected Louisiana's claim that its entitlement to licensing fees was sufficient to render its interest in the licensing scheme proprietary.   Contrasting the scheme with others where the state's labor or capital is more directly tied to the venture, see id. at 24, the Supreme Court found no property interest where, as here, "the State's core concern [in issuing video poker licenses] is regulatory" rather than economic, "an exercise of state police

powers" intended to maintain "public confidence and trust [in] gaming activities," id. at 20-21.

Reichman argues that this decision stands for the proposition that regulatory approval, even if incorporating an economic stake, is regulatory rather than proprietary in nature and therefore inadequate to support a wire fraud charge.  In support of this position, Reichman cites repeatedly to United States v. Novod, 923 F.2d 970 (2d Cir. 1994), for the proposition that the "State, as regulator, has no property interest in the money stolen from private insurance companies," id. at 974.  This statement, however, merely describes imprecisely the holding of a different Second Circuit case: Corcoran v. American Plan Corp., 886 F.2d 16 (2d Cir. 1989), in which the Superintendent of the New York Insurance Department brought a RICO complaint alleging that defendants had committed wire fraud by making misrepresentations to the Insurance Department (specifically, concealing excessive management fees charged, falsely representing a loan as fully secured, and falsely showing a $2 million contribution to surplus) and subsequently looting insurance companies.  There, the Second Circuit affirmed the district court's conclusion that wire fraud had not been adequately alleged, noting that the "Superintendent ma[de] no attempt to allege that the Department had any property right or interest in the monies that the defendant allegedly stole from [the insurance companies]," or that any party--including

policyholders--had in fact been deprived of property through the scheme. Id. at 21-22. As such, the court held that the complaint did not allege a scheme to deprive a victim of a property interest and therefore to defraud.

Contrary to Reichman's suggestions, neither Corcoran nor Cleveland requires us to reach the conclusion that the OID has not been defrauded. For one, Corcoran's language leaves open whether the decision turned on the Superintendent's concession that the insurance department had no relevant property interest or on an independent determination of the insurance regulator's interest. See e.g., United States v. Paccione, 738 F. Supp. 691, 703 (S.D.N.Y. 1990) ("Defendants' reliance on the Second Circuit's decision in Corcoran . . . is unavailing [because i]n that case, the court found that the plaintiff, the State Superintendent of Insurance, had not even attempted to allege that the State had any property interest in the money allegedly stolen by the defendants."); Tsipouras v. W&M Properties, Inc., 9 F. Supp. 2d 365, 367-68 (S.D.N.Y. 1998) (citing Corcoran for the proposition, "RICO claims dismissed where plaintiff did not allege that he has a property right or interest in the monies purportedly stolen by defendants in the course of their mail fraud scheme") (emphasis added); Koal Indus. Corp. v. Asland, S.A., 808 F. Supp. 1143, 1162 (S.D.N.Y. 1992) (citing Corcoran for the proposition, "plaintiff fails to state a claim under mail fraud statute if he has not

alleged 'any property right or interest in the monies that defendants allegedly stole from plaintiff'") (emphasis added).

Indeed, in reaching its conclusion that no property right had been alleged, the Corcoran decision repeatedly emphasized the complaint's total lack of allegations regarding the deprivation of property by any victim; here, by contrast, the Government has specifically identified a number of categories of victims whose property rights have allegedly been implicated by the scheme, and it has explicitly argued that the OID retained a property interest in the regulatory approval of which it was deprived.  Furthermore, the Corcoran court exclusively discussed whether the state could have a property interest in "the monies that defendants allegedly stole from [private companies]," rather than, as here, whether the state could have a property interest in its own regulatory approval--a critical distinction likely motivated by the differing nature of the deception at issue in Corcoran, where the defendants did not deceive to obtain a specific regulatory decision but rather made ongoing misrepresentations in monthly/annual reports about an existing operation.  As such, Corcoran leaves open the possibility that deception to obtain an insurance regulator's approval may constitute a scheme to defraud.

More broadly, a finding that the OID has been deprived of a property interest complements, rather than contravenes, Cleveland's regulatory/economic framework.  While Reichman is

correct that, to constitute a property interest under <u>Cleveland</u>, the decision of a state agency must have a more direct connection to the state fisc than mere "tie[s] to an expected source of revenue," much more has been alleged here.  In particular, the <u>Cleveland</u> Court found Louisiana's interest inadequate based on the nature of the specific licensing scheme at issue, noting that because Louisiana "receives the lion's share of its expected revenue not while the licenses remain in its own hands, but only <u>after</u> they have been issued to licensees," the defendants' deprivation of the state's right to <u>deny</u> a license could hardly be said to have deprived it of property.  In essence, the Court explained, Louisiana's interest was not proprietary because subversion of its interest--wrongful approval of the license--did not "put [any state] labor or capital at risk"; the mere fact that the scheme dealt with money was not then enough to transform it from regulatory to economic.

Here, by contrast, Oklahoma's insurance scheme is economic in both purpose and practice, designed to avoid insurance companies' insolvency in order to safeguard state funds that would inevitably be spent in processing the companies' liquidation and receivership and in satisfying policyholder claims.  As such, the OID's approval scheme might perhaps be best characterized as revenue-protective: while not falling neatly into the dichotomy of "regulatory or revenue-enhancing," <u>Fountain v. United States</u>, 357 F.3d 250 (2d

Cir. 2004) (interpreting Cleveland), such a characterization reveals the scheme's overriding concern for state funds and locates the scheme farther to the revenue than regulatory side of the spectrum.  Put simply, if the state fisc was unharmed--and indeed enhanced--by the wrongful approval in Cleveland, thereby creating insufficient property harm to Louisiana, Oklahoma's state fisc was most certainly "put at risk" by the wrongful approval alleged here. See United States v. Paccione, 738 F. Supp. 691, 703 (S.D.N.Y. 1990) (finding sufficient wire fraud charge where, "[b]y allegedly evading [waste disposal] licensing fees, defendants sought to sidestep a licensing system which safeguards substantial monetary interest of the City and State," "expos[ing] the City and State to paying the costs of cleaning up environmental disasters . . .[i]f the property owners cannot clean up such a disaster"); see also United States v. McMillan, 600 F.3d 434 (5th Cir. 2010) (distinguishing Cleveland and affirming wire fraud convictions where defendants lied to the state insurance department about an HMO's financial viability, resulting in the HMO going into receivership and owing millions of dollars to medical service providers).  Accordingly, we find that the alleged scheme to defraud the OID constituted a scheme to deprive the OID of property, and Count Thirteen therefore properly alleges a charge to defraud the OID, rendering the original indictment sufficient.

18

### B.   Additional Victims

Even were the OID itself not deprived of a property interest, the Superseding Indictment can nevertheless be sustained because it alleges a scheme to defraud through which other victims were sought to be deprived of property.[1]

### 1.   Oppenheimer

First, Reichman argues that the Government has not alleged a scheme to defraud Oppenheimer because Oppenheimer in fact received the benefit of its bargain: according to Reichman, Oppenheimer received the interest payments and collateral as expected for its loan, and any negative effects from Reichman's deception, such as noncompliance with the law and its effect on third parties, were ancillary to the essence of Oppenheimer's bargain in making the loan.  As a result, Reichman contends, Oppenheimer cannot be said

---

[1] To the extent that Reichman argues that these additional victims cannot give rise to a wire fraud charge insofar as they were not themselves deceived, this argument is unavailing.  The "convergence theory," under which an indictment can only state a wire fraud scheme if the person/entity deceived is also him/itself deprived of property, has pointedly not been adopted in the Second Circuit.  See United States v. Evans, 844 F.2d 36 (2d Cir. 1988) ("[T]he case before us today does not require us to decide this general question" of "whether the person deceived also had to lose money or property."); United States v. Novod, 923 F.2d 970 (2d Cir.) on reh'g, 927 F.2d 726 (2d Cir. 1991) ("Evans contended in part that the property must belong to the deceived party, here the United States. We did not reach this question . . . ."). Consequently, several courts have found that wire fraud charges may be sustained where different parties were deceived and harmed. See, e.g., United States v. Vought, No. 3:05CR268 (JBA), 2006 WL 1662882, at *9 (D. Conn. June 15, 2006); United States v. Ying Wai Phillip Ng, 578 F. App'x 38, 40 (2d Cir. 2014) (nonprecedential summary order); cf. United States v. Starr, 816 F.2d 94, 102 (2d Cir. 1987) (Newman, J., concurring) (asserting that "[t]he Government has simply indicted the defendants for defrauding the wrong party," because "[a]n indictment for defrauding the Postal Service [as a result of a deception on customers] would have led to a conviction that would surely have been affirmed").

to have been defrauded and the Government has not shown Reichman's intent to harm Oppenheimer.

In determining whether a scheme has deprived a party of the benefit of its bargain, courts "have drawn a fine line between schemes that do no more than cause their victims to enter into transactions they would otherwise avoid--which do not violate the mail or wire fraud statutes--and schemes that depend for their completion on a misrepresentation of an essential element of the bargain--which do violate the mail and wire fraud statutes." United States v. Shellef, 507 F.3d 82, 108 (2d Cir. 2007). Compare, e.g., United States v. Regent Office Supply Co., 421 F.2d 1174 (2d Cir. 1970) (finding no intent to harm where defendant's salesmen misrepresented facts as part of an aggressive marketing technique because those facts (such as whether salesmen had been referred by a friend or had a large inventory needing to be disposed of) were purely collateral to the sale and did not concern the quality or nature of the goods, which defendants received in accordance with their expectations), and United States v. Novak, 443 F.3d 150 (2d Cir. 2006) (finding no intent to harm where defendants used money from contractors to make kick-back payments, because contractors received their expected benefits (such as using non-union labor) in exchange for money paid), with United States v. Kernan, No. 5:08-CR-61 (FJS), 2009 WL 667432 (N.D.N.Y. Mar. 11, 2009) (finding intent to harm where defendants falsely represented that they were

authorized to write the high-deductible workers compensation
insurance policies they marketed, notwithstanding defendants'
argument that, since they remained obligated under New York
insurance law to insure the organizations they misled, the
organizations received exactly what they bargained for), and
United States v. Frank, 156 F.3d 332 (2d Cir. 1998) (finding intent
to harm where defendants contracted to dispose of sewage legally
but did so illegally at lower cost because compliance with disposal
regulations was an essential part of the bargain).

Here, the deception of Oppenheimer as to the source and
lawfulness of the loan went to an essential part of Oppenheimer's
bargain in making the loan. Reichman's misrepresentations did not
merely cause the bank to issue a loan it might otherwise have
chosen not to, without repercussion or risk. Rather, the
prohibition against the loan, the subversion of which Reichman
concealed, was intended to ensure the loan's security interest for
the bank's benefit; conversely, then, such an unlawful loan left
Oppenheimer with less than it expected, in the form of a weakened
security interest subject to claims of illegitimacy. Indeed, the
allegation that Reichman was repeatedly warned by his co-workers
against issuing the loan suggests that its lawfulness was a key
part of the contract with borrowers--through which Oppenheimer
sought to receive a legally obtained, enforceable security
interest--rather than simply an ancillary concern that the bank

21

abide by relevant laws.   In addition, as the Government notes, "issuance of the loan would (and did) expose Oppenheimer to significant financial risk, including a lawsuit by the Oklahoma Insurance Receiver to recover the illegally pledged collateral as well as other regulatory action, consequences that resulted directly from Reichman's alleged misrepresentations." Gov't Opp'n at 22.   As such, Oppenheimer did not receive the full benefit of its bargain, and Count Thirteen adequately alleges a scheme to defraud Oppenheimer.

>    **2.  Policyholders, State Guaranty Associations, Insurance Companies, and Taxpayers**

Reichman also argues that the newly enumerated victims--the policyholders, state guaranty associations, insurance companies, and taxpayers--cannot be said to have a property interest in the assets of Providence P&C and therefore cannot have been defrauded.[2]

---

[2] To the extent that Reichman also argues--at oral argument and throughout his papers-- that there is no scheme to defraud because the Government has not alleged that he intended to deprive the specific property of the victims, merely that the deprivation of their property was a foreseeable or inevitable consequence, which according to Reichman is insufficient to show intent, his challenge is premature.   Because an intent to harm can be inferred from an intent to deceive where the deception necessarily entails loss or harm to others, see, e.g., United States v. Chandler, 98 F.3d 711, 716 (2d Cir. 1996) ("[H]er intentionally deceptive conduct is inexplicable other than as a means of intentionally exposing Household to an unwanted risk. In the context of this case the intent to harm is inextricably bound to the intent to deceive. . . . Thus, the jury's finding of intent to deceive is the functional equivalent of the essential finding of intent to harm."); United States v. Frank, 156 F.3d 332, 337 (2d Cir. 1998) ("The essence of the appellants' scheme was to obtain money by inducing their customers to pay for services that were not provided. Because the jury here presumably found that the appellants intended to gain from their scheme, it follows that it also found the "functional equivalent"—an intended loss to the appellants' customers."), this argument is better addressed to the sufficiency of the Government's evidence at trial regarding intent.

However, while policyholders may not have an interest in the assets of Providence P&C, they do retain an interest in their insurance coverage, which was directly implicated and put at risk by the alleged conspiracy.  See, e.g., United States v. McMillan, 600 F.3d 434 (5th Cir. 2010) ("The issue is whether the victims' property rights were affected by the misrepresentations [to the state insurance department].  We think they were.  The scheme alleged here was for the defendants to obtain money from the [insurance company] and the insureds in the form of management fees and premiums, respectively, which was possible only because of the [company's] continued operation as a result of the fraudulent statements [to the state insurance department], and then to retain the money rather than pay it out . . . .  Other courts have recognized that the deception of regulatory agencies for the purpose of allowing victimization of third parties is a cognizable mail fraud offense. That is what happened here, as the defendants kept [the company] operating in violation of statutory requirements, only to have [it] end up in liquidation with unpaid claims . . . ."); United States v. Christopher, 142 F.3d 46, 54 (1st Cir. 1998) ("By deceptive representations [the defendant] divert[ed] to his own purposes funds the regulators sought to protect.  Thereafter, both companies became insolvent, threatening or causing actual monetary loss to policyholders and to special funds established under state law to protect policyholders in the

event of a company's insolvency. . . . [T]he causal connection between the deception and the loss of property is obvious.") (emphasis added).

Similarly, the state guaranty associations and the insurance companies who are forced to contribute to the guaranty associations have a clear property interest in the funds that they must now pay to cover Providence P&C's claims, as do the taxpayers, who bear the cost of the tax-deductible payments made by the insurance companies to the guaranty associations to cover the insolvency's losses. See id. (noting loss "to special funds established under state law to protect policyholders in the event of a company's insolvency"); cf. Alliance of American Insurers v. Cuomo, 854 F.2d 591, 598 (2d Cir. 1998) (insurance companies required to pay into state funds that secured claims against other insolvent insurance companies sufficiently alleged an imminent injury to state a claim, because "plaintiffs face a realistic and immediate danger of being unconstitutionally deprived of their property" given the "grim projections on the future financial stability of the [guaranty association]" and the factual reality that they "will be responsible for satisfying claims against it"). Count Thirteen therefore charges a conspiracy to defraud these additional victims.

C.   Reichman's Involvement in the Conspiracy

Next, Reichman contends that the Superseding Indictment must be dismissed because it fails to allege his knowing agreement to the "essential nature" of the conspiracy, which he characterizes as defrauding the OID and its derivative victims.  Specifically, he argues that the Superseding Indictment includes no facts suggesting that he knew of or agreed to a plan to deceive the OID and/or loot Providence P&C, merely that he agreed to deceive Oppenheimer.

The Government counters that the conspiracy alleged was not designed merely to deceive the OID but "to fraudulently purchase Providence P&C through a transaction based on an illegal financing structure"; as a result, "the deception of both Oppenheimer and the OID were critical parts of the overall scheme to purchase Providence P&C's assets" in which Reichman was an active participant.  Gov't Opp'n at 28.

"To be convicted as a member of a conspiracy, a defendant need not know every objective of the conspiracy, every detail of its operation or means employed to achieve the agreed-upon criminal objective, or even the identity of every co-conspirator.  There must [only] be agreement on the 'essential nature of the plan,' and on the kind of criminal conduct in fact contemplated."  United States v. Gleason, 616 F.2d 2, 16 (2d Cir. 1979) (internal citations and quotation marks omitted).  "It is also settled that

the existence of a conspiracy, and a defendant's membership in it, may be proved entirely by circumstantial evidence." <u>United States v. Martino</u>, 759 F.2d 998, 1002 (2d Cir. 1985).

While Reichman is correct that the Superseding Indictment does not specify that Reichman knew to what end his fraudulent financing of the loan would be put, leaving open the possibility that Reichman issued the loan without knowledge of or involvement in the deception of the OID and/or defrauding of subsequent victims, it also permits the inference that Reichman's actions regarding Oppenheimer reveal his knowledge of and agreement to a broader scheme. Moreover, as the Government notes, Reichman's alleged deception of Oppenheimer was at the core of the charged scheme: without Oppenheimer's financing, there could be no purchase of Providence P&C, and without Reichman's deception, there could be no financing. Thus, as the Government is entitled to prove Reichman's intent and involvement in the ongoing conspiracy through evidence at trial, the charge is sustained.

## IV. Duplicity

Finally, Reichman moves to dismiss Count Thirteen as duplicitous, asserting that the charge impermissibly combines two separate conspiracies: the conspiracy to cause Oppenheimer to issue the loan on the one hand, and other conspirators' plan to deceive the OID and loot Providence P&C on the other.

26

"An indictment is impermissibly duplicitous where (1) it combines two or more distinct crimes into one count in contravention of the requirement of Federal Rule of Criminal Procedure 8(a) that there be 'a separate count for each offense,' and (2) the defendant is prejudiced thereby." United States v. Sturdivant, 244 F.3d 71, 75 (2d Cir. 2001) (quoting United States v. Murray, 618 F.2d 892, 896 (2d Cir. 1980)). However, a count is not duplicitous if it charges a crime with multiple objectives, United States v. Ballistrea, 101 F.3d 827, 835 (2d Cir. 1996), and "acts that could be charged as separate counts of an indictment may instead be charged in a single count if those acts could be characterized as part of a single continuing scheme," United States v. Tutino, 883 F.2d 1125, 1141 (2d Cir. 1989). Further, "it is well established that [t]he allegation in a single count of a conspiracy to commit several crimes is not duplicitous, for [t]he conspiracy is the crime and that is one, however diverse its objects." United States v. Aracri, 968 F.2d 1512, 1518 (2d Cir. 1992) (internal quotation marks omitted).

Here, the two deceptions may be seen as two parts of one conspiracy to fraudulently obtain the assets of Providence P&C, a scheme which required both that Reichman defraud Oppenheimer and that co-conspirators defraud the OID, among others. Consequently, the count is not impermissibly duplicitous.

27

Moreover, "[d]uplicity does not necessarily require dismissal of an indictment. Courts have utilized other remedies when presented with the threat of impermissible duplicity that vary according to the particular harm or harms to be avoided and the stage of the proceeding at which the threatened harm or harms arise. Thus, courts have held that prior to a defendant's conviction, prejudice to the defendant can be avoided by having the government elect to proceed based upon only one of the distinct crimes included within a duplicitous count, or by a jury instruction that ensures that the jury is unanimous as to the conduct underlying the conviction." United States v. Sturdivant, 244 F.3d 71, 79 (2d Cir. 2001) (internal citations and quotation marks omitted). The motion to dismiss the Superseding Indictment as duplicitous is therefore denied.

## CONCLUSION

For the reasons stated herein, defendant's motion is denied in its entirety.

Dated:     New York, New York
           February 4, 2015

NAOMI REICE BUCHWALD
UNITED STATES DISTRICT JUDGE