UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

|  |  |  |
|---|---|---|
| UNITED STATES OF AMERICA | : | |
| - v. - | : | S3 12 Cr. 750 (NRB) |
| WILBUR ANTHONY HUFF, | : | |
| | : | |
| Defendant. | : | |

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

## GOVERNMENT'S SENTENCING MEMORANDUM

PREET BHARARA
United States Attorney for the
Southern District of New York
Attorney for the United States of America

Janis M. Echenberg
Daniel B. Tehrani
Assistant United States Attorneys

Tino Lisella
Trial Attorney
United States Department of Justice,
Tax Division

Dated:  May 28, 2015

The Government, by and through the attorneys below, respectfully submits this memorandum in connection with the sentencing of defendant Wilbur Anthony Huff ("Huff" or the "defendant"), which is scheduled for June 4, 2015 at 3:00 p.m.  The Presentence Investigation Report ("PSR") prepared by the United States Probation Department ("Probation Department"), dated May 14, 2015, has correctly calculated the applicable United States Sentencing Guidelines ("Guidelines" or "U.S.S.G.") total offense level of 43, with a Guidelines range of 144 months' (12 years') imprisonment, and concluded that there are no circumstances requiring a departure or variance.  The Probation Department therefore recommends a sentence of twelve years' imprisonment.  (PSR at 36.)

In the plea agreement between the parties, the Government and the defendant jointly agreed not to seek a sentence other than 12 years' imprisonment.  (PSR ¶ 8).  In his submission dated May 21, 2015, the defendant reiterates this agreement not to seek any sentence other than twelve years' imprisonment.  (Huff Subm. at 8).  Consistent with the Probation Department's recommendation, and for the reasons set forth below, given the nature and circumstances of the offenses – which were deliberate, extensive, complex and exceeded $100 million of losses to more than 1,500 victims, including small business owners, federal and state regulatory agencies and a federally-insured bank – and the great need in this case to promote deterrence and ensure just punishment for this incorrigible fraudster, a sentence of twelve years' imprisonment is entirely appropriate.

## BACKGROUND AND FACTUAL SUMMARY

### The Guilty Plea and Plea Agreement

After a multi-year investigation, involving at least six federal and state agencies and two United States Attorney's Offices, Huff was arrested on October 1, 2012 pursuant to a thirteen-count indictment charged him with his role in four interrelated fraud schemes, which spanned four states, and involved tax violations, bank bribery, fraud on bank regulators, and the fraudulent purchase of an insurance company.  The Government later superseded to add four additional tax-related charges.

On December 23, 2014, Huff, who lived and worked in Louisville, Kentucky during the relevant time period, pleaded guilty, pursuant to a plea agreement (the "Plea Agreement"), to a four-count Superseding Information (the "Information"). The Information charged him with corrupt obstruction of the due administration of the Internal Revenue Service ("IRS") laws, resulting in the failure of Florida company O2HR to pay over $53 million to the IRS, in violation of Title 26, United States Code, Section 7212(a) (Count One); aiding and abetting the false preparation of tax returns which misled the IRS about more than $16 million in taxes that were due and owing, in violation of Title 26, United States Code, Section 7206(2) (Count Two); wilful failure to pay taxes, in violation of Title 26, United States Code, Section 7203 and Title 18, United States Code, Section 2 (Count Three); and a multi-object conspiracy to (i) commit bank bribery, by paying hundreds of thousands of dollars to New York bank executives in exchange for preferable treatment at their bank, (ii) defraud bank regulators through a $6.5 million "round-trip" transaction disguised as new capital being infused into the same New York bank, and (iii) commit wire fraud during the illegal $37.5 million purchase of an Oklahoma insurance company. (PSR ¶¶ 1-7).

Counts One and Two each carry maximum terms of imprisonment of three years.  Count Three carries a maximum term of imprisonment of one year.  And Count Four carries a

maximum term of imprisonment of five years.  (PSR at 2-3). Accordingly, the total maximum

term of imprisonment on Counts One through Four is 12 years.

Pursuant to the Plea Agreement, the parties agreed that the Guidelines range applicable to

the defendant's conduct is as follows:

1.  The applicable Guidelines manual is the November 1, 2014 Guidelines
    Manual.

2.  Pursuant to U.S.S.G § 3D1.2(d), Counts One, Two, Three and Four are
    grouped together as a single group.

3.  Pursuant to U.S.S.G § 2B1.1(a), the base offense level for the group is 6.

4.  Because the loss from the offenses to which the defendant has pleaded guilty,
    described in Counts One, Two, Three and Four of the Information, exceeded
    $100,000,000 but was less than $200,000,000, a 26-level increase is warranted
    pursuant to U.S.S.G. § 2B1.1(b)(1)(N).

5.  Because the offenses involved more than 250 victims, a 6-level increase is
    warranted pursuant to § 2B1.1(b)(2)(C).

6.  Because the offenses involved sophisticated means, a 2-level increase is
    warranted pursuant to U.S.S.G. § 2B1.1(b)(10)(C).

7.  Because the offenses substantially jeopardized the soundness of a financial
    institution, a 4-level increase is warranted pursuant to U.S.S.G.
    §2B1.1(b)(16)(B)(i).[1]

8.  Because the defendant was an organizer or leader of a criminal activity that
    involved five or more participants or was otherwise extensive, a 4-level
    increase is warranted pursuant to §3B1.1(a).

Assuming the defendant clearly demonstrates acceptance of responsibility, to the satisfaction of

the Government, through his allocution and subsequent conduct prior to the imposition of

sentence, a two-level reduction will be warranted, pursuant to U.S.S.G. § 3E1.1(a).  Furthermore,

---

[1] As noted below, pursuant to § 2B1.1(b)(16)(C), the cumulative adjustments from the
application of § 2B1.1(b)(2) and § 2B1.1(b)(16)(B) shall not exceed eight levels.  Accordingly,
the Government concedes that this enhancement should have resulted in a two-level, rather than
a four-level adjustment.  However, as discussed below, the Stipulated Statutory Sentence of 12
years' imprisonment agreed to by the parties is not impacted by this adjustment.

assuming the defendant has accepted responsibility as described in the previous sentence, the Government will move at sentencing for an additional one-level reduction, pursuant to U.S.S.G. § 3E1.1(b), because the defendant gave timely notice of his intention to enter a plea of guilty, thereby permitting the Government to avoid preparing for trial and permitting the Court to allocate its resources efficiently.  Based on the above, the applicable Guidelines offense level in the plea agreement was 45.  (PSR ¶ 8).

The defendant has one criminal history point due to his guilty plea in 2003 to three counts of mail fraud related to his procuring loans in 1995 and 1996 upon the false representation that he would use the money to pay insurance premiums.  (PSR ¶¶ 82-86).  The defendant also has a 1995 conviction for disorderly conduct resulting from a drunk driving incident in which he showed his brother's driver's license to the police officer who stopped his car (because his had been suspended), and later failed to appear in court, resulting in a warrant being issued for his brother.  Huff received a 30-day sentence of incarceration as a result of this conviction.  Given the age of the conviction, however, it resulted in zero criminal history points.  (PSR ¶¶ 80-81).

Based on an offense level of 45 and the defendant's Criminal History Category of I, the stipulated Guidelines range in the plea agreement is life imprisonment.  The statutory maximum sentence for the defendant's conviction on Counts One through Four of the Information, however, is 12 years' imprisonment.  Accordingly, the parties agreed that the maximum sentence that can be imposed on the defendant is 12 years' imprisonment (the "Stipulated Statutory Sentence").  (PSR ¶ 8).

Pursuant to the Plea Agreement, the parties agreed that neither a downward nor an upward departure from the Stipulated Statutory Sentence was warranted, and thus neither party will seek any departure or adjustment pursuant to the Guidelines.  The parties further agreed not

to seek a sentence other than the Stipulated Statutory Sentence based on any other factors or bases.  (*Id.*).

## The Probation Department's Guidelines Calculation

The Guidelines calculation by the Probation Department is virtually the same as the calculation stipulated to by the parties, although the Probation Department correctly notes that, pursuant to U.S.S.G. § 2B1.1(b)(16)(C), the cumulative adjustments from the application of U.S.S.G. §§ 2B1.1(b)(2) and 2B1.1(b)(16)(B) shall not exceed eight levels.  (PSR ¶ 69). Accordingly, the adjustments from these two enhancements add eight levels, rather than the 10 levels added under the parties' stipulated agreement.  As a result, the Probation Department calculates a total offense level of 43, rather than 45.  (PSR ¶ 78).  The Government does not dispute this calculation.  In any event, pursuant to the commentary to the sentencing table in Chapter 5 of the Guidelines, in those rare instances where the total offense level calculated is in excess of 43, the offense level is to be treated as level 43.  (PSR ¶ 117).  For both this reason, as well as the fact that, at either offense level 43 or 45, the Guidelines exceed the statutory maximum of 12 years' imprisonment, the application of U.S.S.G. § 2B1.1(b)(16)(C) does not affect the applicable Guidelines range.

The Probation Department agrees with the Plea Agreement's Guidelines range calculation of life imprisonment and Stipulated Statutory Sentence of twelve years.  (PSR ¶ 116).

The Probation Department recommends a sentence of three years each on Counts One and Two, one year on Count Three and five years on Count Four, to run consecutively, for a total of 12 years' imprisonment.  (PSR at 34).

## Prior Fraudulent Conduct

The defendant is a perpetual fraudster, having been engaged, since at least in or about 1995, in a series of duplicitous schemes, which have grown larger and more complex with time. In 2003, Huff pleaded guilty to three counts of mail fraud.[2]  The fraud involved making false statements, in 1995 and 1996, to obtain loans Huff claimed would be used for business purposes, but were used for his own personal benefit.  (PSR ¶ 83).  After serving 12 months' probation in 2004, Huff remained undeterred.

Separately, during the early 2000s, using a company called Midwest Merger Management, which he formed in 2001 under the names of his wife and the wife of a co-conspirator, Huff proceeded to control improperly and loot a professional employer organization ("PEO") called Certified.  As Your Honor is aware, a PEO provides its client companies with outsourced management of the payroll, tax and workers' compensation insurance obligations, including the collection and remittance of employment taxes.  Between at least 2001 and 2004, Huff improperly took Certified funds intended for insurance premiums and other contracted services, and used them for his own personal expenses.  His conduct resulted in two significant civil judgments against him, neither of which he has paid, nor seem to have deterred his criminal behavior in any way.

First, in or around May 2010, the Washington State Insurance Commissioner obtained a civil judgment of over $21.8 million for fraud, misrepresentation, misappropriation, civil conspiracy, breach of contract and violations of the Washington Criminal Profiteering Act and Consumer Protection Act, related to Huff's looting of Certified.  The judgment followed a jury trial in the Western District of Washington.  <u>Mike Kreidler, Insurance Commissioner for the State of Washington and as Receiver for Cascade National Insurance Company, in Liquidation,</u>

---

[2] Huff's father, Marion Huff, was his co-defendant in this case but the charges against Huff's father were ultimately dismissed.

v. Danny Pixler, Anthony Huff and Midwest Merger Management, LLC, 06 Civ. 697 (RSL)
(W.D. Wa.).  Huff has made no payments on this judgment nor has the plaintiff been able to find
any assets to satisfy its judgment.

       In or around September 2010, after a seven-day bench trial, a United States Magistrate
Judge in the Southern District of Florida also found Huff civilly liable for his looting of Certified
and for misleading the SEC and the investing public regarding Certified's financial condition.
The judge found that Huff and his wife improperly obtained nearly $13 million dollars of
Certified's money for their own personal use, which they were ordered to disgorge.  SEC v.
Huff, et al., 08 Civ. 60315, (RSR) (S.D. Fl.), Docket No. 320 (the court's amended findings of
fact and conclusions of law is attached as **Exhibit A**).  To date, neither Huff nor his wife has
made any payments under the disgorgement order.

Offense Conduct

       In or around 2005, after Huff drove Certified into bankruptcy due to his looting, but
before the civil judgments described above, Huff purchased Certified's assets out of bankruptcy
to create O2HR, again using another individual as a front to own the company on paper.
O2HR's primary place of business, and much of the staff, remained the same.  And Huff began
the scheme again – this time looting even more.  Between the fourth quarter of 2008 and the end
of 2009 (while fighting the SEC charges, which were filed in or around March 2008), Huff took,
for his own personal benefit, at least $58 million that O2HR had promised to more than 1,500
clients it would pay over to the IRS and insurance providers.

       This scheme to defraud the IRS is one of the schemes to which Huff pleaded guilty in the
instant case, and is set forth in Counts One, Two and Three of the Information.  Huff has also
admitted to his role in orchestrating a conspiracy involving three additional, interrelated fraud

schemes between 2007 and 2010: bank bribery, fraud on bank regulators and the fraudulent

purchase an Oklahoma insurance company.  Although the schemes are set forth in great detail in

the Information to which Huff pled guilty and the PSR, and the Court has become familiar with

the schemes through extensive litigation in this case, each of Huff's schemes are described

briefly in more detail below.

Bank Bribery

Central to all of the crimes to which Huff has pleaded guilty was his corrupt relationship

with Charles Antonucci and Matthew Morris, the President and Vice President, respectively, of

Park Avenue Bank, a New York FDIC-insured bank that collapsed and was closed by federal and

state regulators in or around March 2010, due in part to the schemes described herein.  During

the relevant time period, Huff paid bribes totaling at least $400,000 to Antonucci and Morris in

exchange for favorable treatment at Park Avenue Bank, where Huff controlled at least 22 bank

accounts.  For example, at Huff's request, Antonucci provided a potential investor in Huff's

Accredited Investor Resources group ("AIR," a/k/a Oxygen Investment Partners or "OIP")  two

fraudulent letters of credit totaling $1.75 million that purported to provide a payout if the

investment failed, and Antonucci further assured the investor that Huff's investment was

advisable. (Attached for reference, as **Exhibit B**, is an email exchange in which Huff coaches

Antonucci on what to say to the potential investor to induce him to make an "OIP" investment.)[3]

Huff's corrupt relationship with Antonucci and Morris also resulted in Huff's entities

being allowed to accrue in excess of $9 million in overdrafts and being allowed to engage in

intra-bank transfers that would otherwise have been investigated and likely prevented – as they

had been at other banks where Huff had previously held accounts.  Finally, through his bribes,

---

[3] Although the Government has not charged Huff with any crime in connection with AIR, based
on its investigation (including recorded calls during which Huff speaks with AIR investors), the
Government does not believe this was an isolated misrepresentation to an AIR investor.

Huff obtained $4.5 million in loans by submitting loan applications that contained false

statements, including that Huff's assistant had a 99% ownership in a company worth

approximately $2 million, when, in truth, she earned a modest salary and had minimal assets.

(Attach for reference, as **Exhibit C**, is Huff's assistant's personal financial statement that was

attached to the loan application)  (PSR ¶¶ 14-17, 19, 32-39).

The improperly obtained $4.5 million in loans resulted in the losses to the FDIC and

Valley National Bank (the bank to whom Park Avenue Bank's remaining assets were sold).  As a

result of this loan fraud, Huff has agreed to forfeiture of $4,500,000 and to restitution of

$4,857,266.62 to the Federal Deposit Insurance Corporation and $597,420.29 to Valley National

Bank.

<u>Tax Fraud</u>

Through Huff's covert control of various bank accounts at Park Avenue Bank, he was

able to divert millions of dollars paid by O2HR's more than 1,500 clients, which O2HR was

contractually obligated to pay over to the IRS ($53 million) and the client's insurance providers

($5 million) to himself and his own interests unrelated to O2HR.  Although O2HR was

contractually obligated to pay over to the IRS and relevant insurance carriers the money it billed

and collected from its clients, Huff diverted and stole much of the money instead.  Attached for

reference as **Exhibits D and E** are a sample invoice and contract for one of O2HR's clients

whose tax liabilities to the IRS remained unpaid despite the client paying over sufficient funds to

O2HR.  The invoice demonstrates how the clients were billed for their tax and insurance

obligations. The contract sets forth O2HR's obligation to pay these sums over to the relevant

entities – the IRS and the insurance providers (*See, e.g.,* "O2HR shall…make the appropriate

payroll deductions and collection of taxes, file the appropriate reports and make payment to

proper governmental authorities for federal, state, and local income taxes, Social Security tax, federal and state unemployment insurance states and any other federal or state tax."  Contract at IV. C., p. 2).  In some cases, Huff directly instructed O2HR employees to divert money to accounts he controlled.  Attached for reference is **Exhibit F**, in which Huff's assistant directs an O2HR employee to make daily wires of $100,000 from O2HR's bank account to another account controlled by Huff, and an accompanying chart prepared by the employee reflecting transfers he made pursuant to this directive.  In other instances, Huff's assistant transferred money out of accounts where it was being held specifically for tax and insurance obligations.

Huff also directed that false statements be submitted to the IRS to artificially lower O2HR's tax obligations to prevent the theft from being detected.  Attached for reference, as **Exhibit G**, is an email chain from an O2HR employee explaining to her supervisor that she has reduced the tax obligation reflected on the IRS Form 941 by 34% (as directed by Huff), and a subsequent request to Huff's assistant that she share the information with her "boy" (Huff). (PSR ¶¶ 17, 23-26, 29-30).

As Huff well knew, fraud on the IRS through a PEO company is particularly hard to detect because a PEO submits the Forms 941 as if it is the sole employer, when in fact it is a combined obligation representing amounts owed by each of its individual clients, primarily small business owners.  The clients, who had paid over to O2HR the taxes due, believed that those monies were then timely transferred to the IRS.  The clients received invoices and others statements from O2HR to that effect.  The IRS relied on O2HR's submissions, and once it determined that payments were deficient, it contacted O2HR, who sent the IRS to individual clients, who of course reported that they had paid.  By the time the fraud was fully uncovered,

O2HR (which had no official connection to Huff to begin with) had been sold again and was operating under a new name.

Huff used the money he stole for, among other things, unrelated business ventures and to pay for his and his family members' personal expenses, including:

- mortgages and other payments related to his properties, that had no connection to O2HR, including his family residence,  staff and equipment for his farm, the purchase of and improvements to a golf course he owned; and rent payments for his children's apartments;

- loan payments for the purchase of private jets, as well as trips on those private jets, including to sporting events such as the Super Bowl and to resort locations outside of the United States, including Mexico and the Virgin Islands;

- lavish AIR investor conferences, including payment for stays at exclusive resorts and for entertainment, including over $50,000 spent on Kentucky Derby tickets and events at the same time Huff was directing O2HR employees not to pay the federal employment taxes due and owing; and

- designer clothing, jewelry and luxury cars.

Connecting these expenses to Huff was not a simple task.  (PSR ¶ 31).  The Government traced the money through literally hundreds of banks, financial institutions and accounts, from O2HR's bank accounts to various accounts controlled by Huff, and then sometimes to credit cards in his and his family members names, and finally to the personal expenses described above.  The Government ultimately retained a forensic accounting expert to assist in this massive tracing effort.  (Attached as **Exhibit H** is a chart prepared by a forensic accountant demonstrating the complexity of the scheme, as it shows the many accounts that O2HR client

money was transferred to in the first instance during calendar year 2009.  The money was then

spent, directly from those accounts, on expenses unrelated to O2HR, or transferred to other

accounts controlled by Huff.  At the time Huff pled guilty, the Government had not completed its

tracing effort, but had managed to identify millions of dollars of personal expenses paid for with

O2HR client funds, as described in the paragraph above.

As a result of this fraud, Huff has agreed to restitution of $53,094,219 to the IRS.[4]  It is

unclear how much of this or the other restitution amounts Huff will actually be able to pay as he

has reported minimal income to Pretrial Services, there is currently little or no equity in his

properties, and his primary residence was destroyed in a fire on or about March 25, 2014.[5]

<u>Fraud on Bank Regulators</u>

This multi-part scheme involved the use of Park Avenue Bank's own money to deceive

bank regulators into believing that the bank had received a much-needed independent infusion of

---

[4] In addition to causing O2HR to fail to pay $53 million in employment taxes to the IRS, Huff also failed to report in his personal income tax filings the millions of dollars he embezzled from O2HR.  It is well established that gains, both lawful and unlawful, are taxable.  *See James v. United States*, 366 U.S. 213, 218 (1961).  Specifically, for the fourth quarter of 2008 (when the defendant caused O2HR to fail to pay approximately $10,183,218 in employment taxes), he caused approximately $4,160,349 to be transferred directly from O2HR's operating accounts into other bank accounts that he controlled but which were not associated with O2HR.  Similarly in 2009 (when the defendant caused O2HR to fail to pay approximately $42,911,001 in employment taxes), he caused approximately $18,780,809 to be transferred directly from O2HR's operating account into other bank accounts that he controlled but were not associated with O2HR.  In 2008, the defendant filed an individual income tax return that reported $46,800 in adjusted gross income.  Had the defendant reported the at least approximately $4,160,349 that he embezzled from O2HR's clients for the last quarter of 2008 alone, he should have paid approximately $1.4 million in income taxes for 2008.  Instead, he reported a tax liability of $5,813.  For 2009, the defendant filed an individual income tax return that reported negative adjusted gross income of $22,858.  Had he reported the approximately $18,780,809 that he embezzled from O2HR's clients, he should have paid approximately $6.5 million in income taxes for 2009.  Instead, the defendant reported a loss and applied for a refund of $949.  In sum, not only did the defendant cause O2HR to evade $53 million in employment taxes, he filed individual income tax returns that omitted at least $22 million in embezzlement income.
[5] As of May 19, 2015, the Louisville Metro Arson Bureau had not completed its arson investigation related to the March 25, 2014 fire at Huff's home.

$6.5 million.  That "round trip transaction" was then followed by a sophisticated cover up that involved engaging a law firm to create fraudulent corporate documents and later the theft of $2.3 million from a publicly-traded company that Huff also covertly controlled (GEE), and later still, the creation of a fake certificate of deposit to try to cover up the theft.   As a result of this fraud, Huff has agreed to forfeiture of $2,300,000, representing the money taken from GEE.

The fraud scheme was conceived in or around October 2008, when Park Avenue Bank was on the verge of being classified by regulators as "undercapitalized," meaning it was unable to maintain the required level of capital on deposit, and would therefore be prohibited from engaging in certain types of banking transactions and subject to enforcement actions.   (PSR ¶¶ 42-43).  In an effort to deceive regulators into believing that the bank's financial situation was not as dire as it seemed, Huff, Morris and Antonucci agreed to transfer approximately $6.5 million of the bank's money to Huff, in the form of loans or lines of credit to various companies whose bank accounts Huff controlled at Park Avenue Bank.  Huff then transferred the money to Bedford Consulting Group ("Bedford"), a company owned by Antonucci.  Antonucci then purported to "invest" the money, then in Bedford's account, in the bank, publicly calling it an independent infusion of cash.  (PSR ¶¶ 45-48).  A demonstrative of the complex flow of money from the round trip transaction is attached as **Exhibit I**.

In or around October 2009, Huff further concealed the round-trip transaction by engaging attorneys in Louisville, Kentucky to draft false and backdated agreements in an effort to deceive regulators into believing that Antonucci had actually "earned" the $6.5 million by selling an interest in Bedford, which, in truth, had not occurred and, in any event, had little or no value at the relevant time.  (PSR ¶ 49).  The Government was able to obtain Huff's communications with his attorneys, as well as various iterations of the back-dated documents, through successful

litigation under the crime-fraud exception to the attorney client privilege.  These attempts by Huff to conceal the true source of the funds further delayed the FDIC, the New York Department of Financial Services and other regulators from uncovering the fraud and understanding the true dire financial situation at Park Avenue Bank.

In yet another effort to conceal the source of a portion of the round-trip transaction funds, Huff, Morris and Antonucci took, without authorization, nearly all of working capital of GEE – a public company controlled by an associate of Huff – and then defrauded GEE's Board of Directors, outside auditors and shareholders by falsely claiming that GEE's money was being held for GEE's benefit in a Park Avenue Bank certificate of deposit.  Huff and his co-conspirators even created a fake certificate of deposit to deceive GEE.  In truth, Huff directed that the money be used to pay back one of the original round-trip transaction loans, which was about to be scrutinized because the company it had been funneled through – USIG, another company Huff covertly-controlled – had filed for bankruptcy.  Once the theft from GEE was finally uncovered, Huff took money from yet another series of companies he controlled to "pay back" GEE and stop further scrutiny by GEE's auditors. (PSR ¶ 50).   He then had the audacity to appear at Park Avenue Bank and attempt to redeem the fake certificate of deposit. (PSR ¶ 51).

<u>Fraudulent Purchase of Providence Property & Casualty</u>

Huff, Morris, Antonucci and co-defendant Allen Reichman engaged in yet another scheme to illegally purchase an Oklahoma insurance company called Providence Property and Casualty ("Providence P&C").  Huff, Morris, Antonucci and Reichman conspired to defraud the Oklahoma Insurance Department ("OID") and Oppenheimer (the financial institution that ultimately provided the loan) by making and causing to be made material misrepresentations and omissions regarding the source of $37.5 million used to purchase Providence P&C.  Primary among these misrepresentations was a letter signed by Morris (attached as **Exhibit J**), falsely claiming that the purchase was being financed by Park Avenue Bank.  This letter was then

included in the submission to the OID for approval of Antonucci's purchase of Providence P&C.

In fact, as Huff well knew, the purchase was financed with a $30 million loan, facilitated by

Reichman, that illegally used Providence P&C's assets as collateral rather than maintaining those

assets as a surplus to pay claims, as required by OID regulations and Oklahoma law, and as

understood by the co-conspirators.

As a result of these misrepresentations, the OID approved the sale of Providence P&C.

The transaction rendered Providence P&C insolvent because the state-mandated surplus was

encumbered by the loan used to finance the purchase, leaving the company with insufficient

funds to pay policyholder claims. State regulators did not uncover the company's true financial

situation for nearly a year, however, before they placed it in receivership. Before the Providence

P&C was put into receivership, Huff also looted the company, directing that $4,000,000 be

transferred out of the company's account to a another account he controlled at Park Avenue

Bank, to be used to pay tax debt accrued in the tax fraud scheme described above.  (PSR ¶¶ 52-

57).  As a result of this fraud, Huff has agreed to forfeiture of $4,000,000 and restitution of

$70,100,000 to the Receiver for Park Avenue P&C (the successor to Providence P&C).

A copy of the proposed forfeiture order is attached as **Exhibit K**.  The Government will

submit a signed copy of the proposed order at sentencing.

**ARGUMENT**

The Government respectfully submits that a sentence of 12 years' imprisonment,

consistent with the Guidelines and the parties' agreement, is warranted and fully supported by

the factors set forth in Title 18, United States Code, Section 3553(a).  In particular, a 12-year

sentence is sufficient but not greater than necessary: (i) to reflect the nature and circumstances of

the defendant's offenses and his history and characteristics; (ii) to reflect the seriousness of the

offense, promote respect for the law and provide just punishment for the defendant's repeated

criminal conduct; (iii) to afford adequate deterrence to others; and, perhaps most importantly,

(iv) to protect the public from further crimes by this recidivist fraudster.  *See* 18 U.S.C.

§ 3553(a)(1), (a)(2)(A)-(C).

Huff is a serial fraudster who has spent at least the last decade stealing more than $100

million dollars for his own personal benefit.  His prior frauds have already resulted in a criminal

sentence of probation and civil judgments of nearly $35 million that the defendant has blatantly

flouted.  Simply put, federal probation and civil judgments have not deterred him from a life of

fraud.  Consequently, adequate deterrence, both specific and general, is essential.

The potential impact of incarceration to the defendant's family, as highlighted in the

defense submission, is unfortunately not unique.  Many defendants care for family members who

will suffer adverse consequences as a result of their criminal behavior.  This defendant

deliberately engaged in massive frauds for years, knowing he had family who might suffer if he

was incarcerated as a result of those crimes.  In addition, although the defense submission

attempts to portray Huff as a family-man and bedrock of the community, in reality he has used

his own family in his frauds and has funded their lifestyles through his various lucrative

schemes.  Huff has, for years, used his wife's accounts and companies in her name to operate his

frauds.  For that reason, she was a named defendant in the SEC's case that resulted in a multi-

million dollar disgorgement order.  Huff's children have also benefited financially from his

schemes, both as nominal employees of his companies, who did no actual work, and as the

recipients of fraud proceeds to fund vacations and other personal endeavors.

In addition, Huff used his "divorce" from his wife for tax benefit.  Although he now

claims that their 1994 divorce was a mistake and a misunderstanding – one he was not even

aware of until 1998, well after they reconciled -- and they have lived as a married couple ever since (PSR ¶ 97-98, Huff Subm. at 3), Huff  claimed a tax deduction for alimony payments during at least the tax years 2000 through 2005.  Huff also traveled frequently during the course of the charged schemes, apparently leaving his wife's care to others during that time.  In addition, bank records reflect that Huff donated at least approximately $75,000 of fraud proceeds (O2HR's money intended for the IRS) to his church during the relevant time period.  While the defense urges the Court to see a "more well-rounded portrait of Mr. Huff," even his apparent good deeds are tainted by fraud.

The defendant has shown repeatedly that, if given the opportunity, he will commit fraud. Thus, a 12-year sentence is necessary to protect the community from the defendant's fraudulent conduct, at least for that period of time.  In addition, a significant sentence of incarceration is necessary here to punish the defendant for the crimes he has committed involving intended losses of well over $100 million, and to promote respect for the law -- for which he has historically shown none.

Because the defendant agreed at the time of his guilty plea that a significant term of incarceration was appropriate, and he has had more than five months since the plea to get his affairs in order, the Government also respectfully requests that the defendant begin any term of incarceration immediately following sentencing.

## CONCLUSION

For the foregoing reasons, the Government respectfully submits that a sentence of three years each on Counts One and Two, one year on Count Three, and five years on Count Four, to run consecutively, for a total of 12 years' imprisonment, is sufficient, but not greater than necessary, to meet the goals of Section 3553(a).

Respectfully Submitted,

PREET BHARARA
United States Attorney

By:  _Janis M. Echenberg_____

Janis M. Echenberg
Daniel B. Tehrani
Assistant United States Attorneys
(212) 637-2597/2455

Tino Lisella
Trial Attorney
United States Department of Justice,
Tax Division